Martin GLASS, Plaintiff–Appellant,

v.

KIDDER PEABODY & CO., INC.,
a Delaware Corporation,
Defendant–Appellee,

and

Daniel J. Mulhaul; William F.
Branston, Defendants.

No. 91–1756.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1992.

Decided May 22, 1997.

**ARGUED:** Michael Louis Schwartz, Fila, Schwartz & Bloomberg, Columbia, Maryland, for Appellant. Henry Robbins Lord, Piper & Marbury, Baltimore, Maryland, for Appellee.

Before RUSSELL, HALL, and WILLIAMS, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge DONALD S. RUSSELL wrote the opinion, in which Judge K.K. HALL and Judge WILLIAMS joined.

## OPINION

DONALD S. RUSSELL, Circuit Judge:

In this action, appellant Martin Glass ("Glass") seeks recovery from Kidder, Peabody & Co., Inc. ("Kidder") for the losses he allegedly sustained because of Kidder's improper and fraudulent mishandling of Glass's stock brokerage account, which Glass opened with Kidder in May 1982, and continued until October 1984. Although the initial agreement covering the account did not include an arbitration clause, the district court, pursuant to an arbitration clause in a revised brokerage agreement, entered an order to arbitrate this dispute on August 22, 1988. Because Glass, however, waited approximately two and one-half years before filing a demand for arbitration, the district court subsequently entered an order terminating the arbitration and dismissing Glass's cause

of action on the ground of laches. Glass appeals both the termination of arbitration and the dismissal of his suit. We reverse the district court's order. Accordingly, we remand the case to the district court, instructing it to return the case to the arbitrators to resolve the parties' disputes pursuant to the terms of their brokerage agreement.

## I.

As indicated above, the original brokerage agreement covering Glass's account did not contain an arbitration clause. On October 1, 1983, however, the parties revised the original agreement by adding a put-and-call provision, as well as a standard arbitration clause covering any disputed transaction occurring in connection with the agreement. The arbitration clause limited the arbitration process to only those transactions which had occurred between the parties after October 1, 1983.

Glass's brokerage account was relatively active during its existence. At some point in 1983, however, Glass became dissatisfied with the way in which Kidder was handling his account. He began expressing his strong dissatisfaction in written and oral complaints, which he registered with Kidder and its Compliance Manager. During the ensuing discussions, Glass, on several occasions, indicated to Kidder representatives his intention to sue Kidder for improperly managing and churning[1] his account. Glass terminated his brokerage account on October 23, 1984. Despite having closed his account, Glass continued to demand payment from Kidder, in whole or in part, for the losses his account incurred. Unable to resolve his claims successfully, Glass filed suit against Kidder on July 23, 1985, in United States District Court in Maryland. Judge Young presided over the suit.

Glass set forth his cause of action in nine counts. Counts I–VIII sought judgment for losses, which he allegedly sustained as a direct result of Kidder's violation of state and federal security statutes and stock exchange regulations. Count IX sought damages for "common law fraud" allegedly committed by Kidder in connection with the account. Upon Kidder's motion for summary judgment, the district court dismissed Counts I–VIII.

With respect to Count IX, Kidder moved to stay the litigation and compel arbitration pursuant to section 3 of the Federal Arbitration Act of 1925 (the "Act").[2] Glass opposed the motion to arbitrate. He believed that Kidder's activities were not subject to arbitration because the fraud involved actions broader than the put-and-call option aspect of their relationship. Glass also opposed arbitration because the scope of the arbitration clause was vague, not understandable, and unenforceable.

By an order dated December 9, 1985, the district court granted Kidder's section 3 motion to stay the proceedings and to compel arbitration under the put-and-call option agreement. Judge Young ruled that:

> The arbitration clause is not so vague as to be unenforceable, and provides that any controversies arising out of options transactions shall be subject to arbitration at the election of either party. Thus any of plaintiff's claims arising out of put-and-call options after October 1, 1983 are subject to arbitration.[3]

Thus, the parties should have proceeded toward arbitration at this time. Yet, for the two years following this order, the parties were unable to agree upon either the arbitration format for resolving Count IX or upon an acceptable way to handle the punitive damages issues.

After Judge Young ordered Count IX to arbitration, Kidder filed successive motions

---

1. Churning occurs when a broker intentionally engages in a continuous course of overtrading an account for the express purpose of generating excessive commissions.

2. Ch. 213, 43 Stat. 883 (current version at 9 U.S.C.A. §§ 1–16 (West 1970 & West Supp. 1996)).

3. *Glass v. Kidder, Peabody & Co.*, Civil No. Y–85–3120, mem. op. at 5 (D.Md. Dec. 9, 1985); J.A. 49.

aimed at dismissing the case.[4] Kidder's first motion sought to dismiss the proceedings because Glass's pleadings failed to allege the cause of action for common law fraud with particularity. Kidder also filed two motions seeking to change venue of the proceedings to New York federal court. Judge Young ruled on these motions by letter dated July 28, 1986. He denied Kidder's first motion, finding that Glass's complaint sufficiently alleged the fraud in paragraphs 9, 10, and 12.[5] Judge Young dismissed the change of venue motions, reasoning that venue was proper in Maryland. He commented that a transfer motion would only have been appropriate when Kidder initially filed its response.[6]

In his letter, Judge Young reiterated that he had ordered the parties to arbitrate Count IX in 1985, and requested that Glass file a status report with him within six months if arbitration had not been concluded. For reasons unknown, the parties failed to arbitrate within the six-month period and fifteen months later, Judge Young consolidated the issue of punitive damages with the question of general liability and ordered they be resolved by arbitration.

In May 1988, Judge Young elected to take senior status, and Judge Motz began overseeing the court proceedings. Upon learning that Judge Motz was replacing Judge Young, Glass requested that Judge Motz resolve the issues preventing them from proceeding to arbitration. Judge Motz set a hearing for July 8, 1988, expressly to resolve the impasse in the proceedings.

At that hearing, the attorneys for the parties agreed, subject to the confirmation by their respective clients, that Judge Motz order that "all of [Glass's] claims for *compensatory* damages shall be considered by the arbitration panel whether these claims arose before or after [Glass's] execution of a Put-and–Call Options Agreement on October 1, 1983;"[7] and that the matters in dispute be referred to the American Arbitration Association (the "AAA"). Judge Motz, however, did not enter his order until August 22, 1988, because the agreement could not take effect without the approval of the parties.[8] The parties later agreed that the arbitration panel would also make a finding as to whether punitive damages should be awarded and the amount of said damages if they were warranted.[9] Judge Motz' arbitration order removed Judge Young's limitation that the arbitration proceedings only consider those put-and-call option transactions occurring af-

4. It is interesting that Kidder, who had initially moved for an order of arbitration in connection with the complaint, changed its position after the issuance of the December 9, 1985 order. Kidder switched from aggressively seeking arbitration to opposing arbitration. Similarly, Glass' opinion toward arbitration changed from hostility to urging the district court to mandate the parties arbitrate.

5. *Glass v. Kidder, Peabody & Co.*, Civil No. Y-85-3120 (D.Md. July 28, 1986) (letter from Judge Young to parties); J.A. 86-87.

6. *Id.*

7. *Glass v. Kidder, Peabody & Co.*, Civil No. JFM-85-3120, order at 2 (D.Md. Aug. 22, 1988); J.A. 51.

8. Kidder's appellate brief states that the revised agreement to arbitrate was reached at the time of the July 8, 1988 hearing. Kidder is in error. On July 8, the parties had not agreed to the terms of the order. For this reason, the district court did not enter its order to arbitrate until August 22, 1988. An agreement to arbitrate is a matter of contract between the parties; it cannot be com-

pelled by the court or by anyone other than the parties themselves. *See AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citing *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) (Brennan, J. concurring)).

9. The issue of punitive damages in an arbitration case is governed by *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Here the Supreme Court declared: "If the contract says 'no punitive damages,' that is the end of the matter, for courts are bound to interpret contracts in accordance with the expressed intentions of the parties—even if the effect of those intentions is to limit arbitration.... On the other hand, we think our decisions in *Allied–Bruce [Terminix Cos. v Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)], *Southland*, and *Perry*, make clear that if contracting parties agree to *include* claims for punitive damages within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms even if a rule of state law should otherwise exclude such claims from arbitration." *Id.* at 56–58, 115 S.Ct. at 1216.

ter October 1, 1983, and extended the arbitration proceedings to encompass all of the transactions between the parties during the life of Glass's account with Kidder.

Despite the agreement at the hearing, the parties still failed to progress toward arbitration. The reason causing their delay is not identified in the record. Whether or not they differed over the arbitration "format" or the issue of punitive damages is unclear. In any event, in early 1991, Glass changed counsel and filed a demand for arbitration with the AAA. As a result, the parties initiated affirmative steps toward arbitration. They began selecting arbitrators from a proposed list of names. After striking certain individuals, the parties selected a panel of three arbitrators and decided that arbitration would commence in Baltimore, Maryland, on July 22, 1991.

While preparing for the arbitration hearing, Glass discovered that William Francis Branston, the Kidder broker who had handled Glass's account, was not registered as a licensed agent in the State of Maryland in violation of the Maryland Securities Act. Glass disclosed his discovery to Kidder by letter on April 30, 1991.[10] In his letter, he also enclosed a subpoena from the AAA for various documents and records relating to Branston's actions as an unlicensed agent in Kidder's employ. Kidder objected to the subpoena and sought to dismiss the case from arbitration. Kidder requested that the AAA hold an administrative conference on these matters prior to arbitration. The arbitrators denied Kidder's request and scheduled the matters for hearing on the date the parties were to commence arbitration.

Kidder then turned to the district court in an attempt to halt the arbitration proceedings by getting the court to dismiss Count IX. With less than two weeks remaining before the starting date of the arbitration hearing, Kidder filed a motion with the district court, requesting the case be dismissed on the grounds of laches. Kidder argued that because "[a] demand for arbitration must be made within a reasonable time after the right to seek arbitration arose,"[11] Glass had waived his right of arbitration due to his failure to timely file his demand for arbitration.[12] Kidder's motion relied on the fact that Glass made a demand for arbitration with the AAA on February 18, 1991—almost two and one-half years after Judge Motz had ordered the case to arbitration on August 22, 1988.

In the alternative, Kidder sought to limit the scope of the arbitration to include only the original complaint and allegations of fact, which Glass had filed in 1985. Kidder also specifically objected to Glass's attempt to subpoena documents and records relating to Branston's participation as an unlicensed agent of Kidder. Kidder argued that the requested documents and records were unrelated to Glass's fraud claim.

Less than a week before the arbitration was scheduled to begin, Judge Motz heard Kidder's motion and orally dismissed the case, not only from arbitration, but from litigation, on the basis of laches. Judge Motz found that Glass had delayed too long before filing his motion to compel arbitration and that such unreasonable delay prejudiced Kidder.

This appeal followed.

## II.

Arbitration has had a checkered career in the law. Beginning in 1609 with *Vynior's Case*,[13] the English courts voiced a firm disapproval of executory arbitration agreements as a vehicle for settling disputes between litigants. The disapproval culminated in England's highest courts denying enforcement of such agreements. In effect, this denial of enforceability nullified the practical value of arbitration agreements.[14] The English courts justified their disapproval by

---

**10.** J.A. 92.

**11.** J.A. 63 (Kidder's memorandum in support of its motion to dismiss or limit scope of arbitration).

**12.** J.A. 63–65.

**13.** 8 Coke Reps. 81(h).

**14.** *See generally Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 983 (2d Cir. 1942).

declaring that arbitration agreements "were against public policy because they 'oust the [court's] jurisdiction'." [15] It appears, however, that their disapproval more accurately reflected their concern over losing their jurisdiction and their fees, the primary source of remuneration for the early judges. [16]

Like the English courts, the American courts began denying the right to judicial enforcement of arbitration agreements. The American courts, however, followed the rule as stated by Justice Story in his *Commentaries on Equity Jurisprudence:*

> [A] court of equity will not anymore than a court of law interfere to enforce the agreement, [to arbitrate future disputes arising out of the contract,] but it will leave the parties to their own good pleasure in regard to such agreements. The regular administration of justice might be impeded or interfered with by such stipulations if they were specifically enforced. [17]

In the early part of this century, expressions of dissatisfaction with the rule against enforcement of arbitration agreements emerged, particularly on the part of commercial interests. Although aware of the rising dissatisfaction, the courts grudgingly continued to follow the established rule. Judge Mack, a preeminent authority on commercial law and practice, opined:

> I recognize the growing sentiment in the commercial world, which is principally concerned in these matters, that the law ought not to intervene and render arbitration agreements ineffective, and the duty of courts, especially in matters essentially of procedure, to free themselves from anachronistic rules and precedents which are opposed to principles and standards of modern jurisprudence. [18]

Judge Hough also forcefully expressed the same reluctance in applying the non-enforcement rule. As a district judge, Judge Hough wrote that the rule of non-enforceability found its basis only in "the antiquity of the rule [rather] than [in] its excellence or reason." [19] Later, as a member of the Second Circuit, in *Atlantic Fruit Co. v. Red Cross Line,* Judge Hough, after commending the New York legislature for enacting the New York Arbitration Act, which provided for the enforcement of arbitration agreements, criticized Congress for its failure to follow the course set by the New York legislature. [20] He also considered whether the lower federal courts should:

> provide some method of overriding, or explaining away not only [their] own previous decisions but those of the Supreme Court, which for a generation or so have been regarded as declaring the law to be that any agreement contained in an executory contract, ousting in advance all courts of every whit of jurisdiction to decide contests arising out of that contract, [would] not be enforced by the courts so ousted. [21]

Judge Hough decided against judicial nullification, declaring that until the Supreme Court takes that step, the lower courts cannot. [22] Judge Hough then suggested that the situation called for legislative action. [23]

In the early part of the twentieth century, a number of states, by legislation, judicial precedent, or both abandoned the nonenforcement rule of arbitration agreements. Typical of these were the legislatures and courts of New York and South Carolina.

---

**15.** *Id.* at 983.

**16.** *See Kulukundis,* 126 F.2d at 983–84 n. 14 & 985 (citing the House Report on the Federal Arbitration Act of 1925).

**17.** *Home Ins. Co. of New York v. Morse,* 87 U.S. (20 Wall.) 445, 452, 22 L.Ed. 365 (1874) (quoting Joseph Story, *Commentaries on Equity Jurisprudence* § 670 (1836)).

**18.** *Atlantic Fruit Co. v. Red Cross Line,* 276 F. 319, 322 (S.D.N.Y.1921), *aff'd,* 5 F.2d 218 (2d Cir.1924).

**19.** *United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co.,* 222 F. 1006, 1007 (S.D.N.Y. 1915).

**20.** 5 F.2d 218, 220 (2d Cir.1924).

**21.** *Id.* at 220.

**22.** *Id.* at 221.

**23.** *Id.*

The New York Arbitration Act of 1920, for instance, directed New York state courts to enforce arbitration agreements.[24] In fact, the Federal Arbitration Act later replicated much of the same language, and even some express provisions of the New York statute. When challenged on constitutional grounds, the Supreme Court upheld the New York legislation in *Red Cross Line v. Atlantic Fruit Co.*[25]

Earlier, South Carolina had followed a similar course by approving the enforcement of arbitration agreements both by statute and by decision. In an opinion authored by Justice Woods, who was later to join this court, the South Carolina Supreme Court declared:

> In early times the disposition of the courts was to look with jealousy on arbitrations, and give them as little force as possible, but later and more intelligent judicial sentiment is strongly in their favor. As said in *Greenville v. Spartanburg,* 62 S.C. 105, 40 S.E. 147 (S.C.1901), "courts favor awards, and will indulge every reasonable presumption to uphold them, and whoever assails them has the burden of clearly establishing their invalidity.... When parties enter into an agreement designed to end litigation, their contract as far as its language will allow should be construed to be effectual and complete to that end." Hence, when on its face the contract may be regarded as providing for either a statutory arbitration or an arbitration at common law, it should be referred to the statute.[26]

Congress eventually responded to the rising tide of dissatisfaction with the ancient rule by enacting the Federal Arbitration Act of 1925. The purpose of the Act was "to place an arbitration agreement upon the same footing as other contracts and to overturn the judiciary's longstanding refusal to enforce agreements to arbitrate."[27] Thus, the Act's enactment signaled a sharp and complete shift from an attitude of inveterate hostility toward arbitration agreements to one strongly favoring arbitration and encouraging the rigorous enforcement of all arbitration agreements.

## III.

Arbitration under the Act is a matter of private contract and is governed by the provisions of the Act, which provides the mechanism by which the contracting parties settle any dispute or controversy qualifying within the scope of their agreement to arbitrate. Sections 2, 3 and 4 of that Act are the key statutory provisions governing the substantive and procedural law associated with arbitration cases and the enforceability of arbitration agreements found valid by the district court.[28] In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,*[29] a case that arose in this circuit and one of the leading cases involving federal arbitration law, the Supreme Court articulated the function of each "key" section. It identified section 2 as the Act's "primary substantive provision."[30] That section consists of a single sentence stating "that a written agreement to 'arbitrate in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"[31] Section 2 has been found by the Supreme Court to manifest Congress's "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive

---

**24.** Current version at N.Y. C.P.L.R. § 7501 (McKinney 1996).

**25.** 264 U.S. 109, 124–25, 44 S.Ct. 274, 277–78, 68 L.Ed. 582 (1924).

**26.** *Bishop v. Valley Falls Mfg. Co.,* 78 S.C. 312, 58 S.E. 939, 939–40 (1907).

**27.** H.R.Rep. No. 68–96 (1924) (as quoted in *Kulukundis,* 126 F.2d at 985).

**28.** *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 400, 87 S.Ct. 1801, 1804, 18 L.Ed.2d 1270 (1967).

**29.** 460 U.S. 1, 24–27, 103 S.Ct. 927, 941–43, 74 L.Ed.2d 765 (1983).

**30.** *Id.* at 24, 103 S.Ct. at 941.

**31.** *Id.* (quoting 9 U.S.C. § 2).

or procedural policies to the contrary." [32] In fact almost forty years ago and before *Cone*, the Second Circuit found that section 2 created a body of federal substantive law applicable in both state and federal courts that compelled the courts to abandon their hostility toward arbitration agreements and required their vigorous enforcement. This was made clear in *Robert Lawrence Co. Inc. v. Devonshire Fabrics, Inc.*, where the Second Circuit declared:

> [T]hat the Arbitration Act in making agreements to arbitrate "valid, irrevocable, and enforceable" created national substantive law clearly constitutional under the maritime and commerce powers of the Congress and that the rights thus created are to be adjudicated by the federal courts whenever such courts have subject matter jurisdiction, including diversity cases, just as the federal courts adjudicate controversies affecting other substantive rights when subject matter jurisdiction over the litigation exists. We hold that the body of law thus created is substantive not procedural in character and that it encompasses questions of interpretation and construction as well as questions of validity, revocability and enforceability of arbitration agreements affecting interstate commerce or maritime affairs, since these two types of legal questions are inextricably intertwined.[33]

The Supreme Court explained that the inclusion in section 2 of the language "involving commerce" demonstrates the Act's broad reach. This is so because the "involving commerce" requirement is "not [ ] an inexplicable limitation on the power of the federal courts, but [ ] a necessary qualification on a statute intended to apply in state and federal

courts." [34] To confine otherwise the scope of section 2 and to limit the enforcement to federal courts would frustrate what Congress intended by the Act to be a broad statement of federal substantive law of arbitrability, applicable to all arbitration agreements within the reach of the Commerce Clause.[35] Thus, we recognized the broad scope of the Act in *Saturn Distribution Corp. v. Williams*, in which we held that the Act preempts " 'conflicting state laws which restrict the validity or enforceability of arbitration agreements.' " [36] This proscription, therefore, preempts state laws which either directly contradict federal law or obstruct the realization and execution of Congressional objectives regarding the Act.[37]

It has been argued that the Act was passed to promote the expeditious resolution of claims, but the Supreme Court in *Dean Witter Reynolds Inc. v. Byrd* [38] repudiated this notion by declaring that the Act's purpose "was to ensure judicial enforcement of privately made agreements to arbitrate." [39] Accordingly, the Act's enforcement provisions, sections 3 and 4, execute the purpose of section 2. Thus, section 3 provides for a stay of litigation in any suit raising an issue subject to an arbitration agreement "until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." [40] Section 4, on the other hand, enables any party who feels "aggrieved by the alleged failure, neglect or refusal of [the other party] to arbitrate under a written agreement for arbitration" to petition the district court "for an order directing that such arbitration proceed in the manner provided for in such agree-

---

**32.** *Id.*; and *see generally* Traci L. Jones, *State Law of Contract Formation in the Shadow of the Federal Arbitration Act*, 46 Duke L.J. 651 (1996).

**33.** 271 F.2d 402, 409 (2d Cir.1959) (internal footnote omitted).

**34.** *Southland Corp. v. Keating*, 465 U.S. 1, 14–15, 104 S.Ct. 852, 860, 79 L.Ed.2d 1 (1984).

**35.** *See Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 2525–26, 96 L.Ed.2d 426 (1987); *Southland*, 465 U.S. at 14, 104 S.Ct. at 860; *Cone* 460 U.S. at 24, 103 S.Ct. at 941.

**36.** 905 F.2d 719, 722 (4th Cir.1990) (quoting *Supak & Sons Mfg. Co. v. Pervel Indus. Inc.*, 593 F.2d 135, 137 (4th Cir.1979)).

**37.** *Saturn*, 905 F.2d at 722.

**38.** 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

**39.** *Id.* at 219, 105 S.Ct. at 1242.

**40.** 9 U.S.C.A. § 3 (West 1970).

ment."[41]  After five days' notice to the party failing to comply with proceeding to arbitration, the district court "shall hear the [parties' complaint,] and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the [district] court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."[42]

Both sections 3 and 4 "call for an expeditious and summary hearing, with only restricted inquiry into factual issues."[43] Hence, whether granting an order to arbitrate under section 3 or section 4, the district court must first determine if the issues in dispute meet the standards of either "substantive arbitrability" or "procedural arbitrability."  A substantive arbitrability inquiry confines the district court to considering *only* those issues relating to the arbitrability of the issue in dispute and the making and performance of the arbitration agreement.[44] As the Third Circuit observed in *Paine-Webber, Inc. v. Hartmann,*[45] the first duty of the district court when reviewing an arbitration proceeding under section 4 of the Act is to conduct a substantive arbitrability inquiry—meaning the court "engage[s] in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement."[46]  If "the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute."[47]  All other issues raised before the court not relating to these

two determinations fall within the ambit of "procedural arbitrability."

The Supreme Court in *John Wiley & Sons, Inc. v. Livingston*[48] concluded that the procedural arbitrability inquiry includes but is not limited to, "whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate."[49]  Hence, the *John Wiley* Court held that "once it is determined, . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."[50]  The First Circuit aptly noted that the *John Wiley* Court so held because:

> the role of a reviewing court is only to determine whether the subject matter of the dispute is arbitrable under the agreement, and not to rule on the merits of the dispute, and because procedural questions are often inextricably bound up with the merits of the dispute, procedural questions should be decided by the arbitrator along with the merits.[51]

The distinction between "substantive arbitrability" and "procedural arbitrability" not only determines the independent yet interrelated responsibilities of the district court and the arbitrator under the Act, but, as the Supreme Court said in *Bernhardt v. Polygraphic Co.:*[52]

> The change from a court of law to an arbitration panel may make a radical difference in ultimate result.  Arbitration carries no right to trial by jury that is

---

41.  9 U.S.C.A. § 4 (West 1970).

42.  *Id.*

43.  *Cone* 460 U.S. at 22, 103 S.Ct. at 940 (footnote omitted).

44.  *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346–47, 4 l.Ed.2d 1403 (1960).

45.  921 F.2d 507, 511 (3d Cir.1990).

46.  *Id.*

47.  *Id.*

48.  376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

49.  *Id.* at 557, 84 S.Ct. at 918.

50.  *Id.*

51.  *Local 285 v. Nonotuck Resource Associates, Inc.,* 64 F.3d 735, 740 (1st Cir.1995).

52.  350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

guaranteed ... by the Seventh Amendment.... Arbitrators do not have the benefit of judicial instruction on the law; they need not give their reasons for their results; the record of their proceedings is not as complete as it is in a court trial; and judicial review of an award is more limited than judicial review of a trial....[53]

Additionally,

[w]hether the arbitrators misconstrued a contract is not open to judicial review. Questions of fault or neglect are solely for the arbitrators' consideration. Arbitrators are not bound by the rules of evidence. They may draw on their personal knowledge in making an award. Absent agreement of the parties, a written transcript of the proceedings is unnecessary. Swearing of witnesses may not be required. And the arbitrators need not disclose the facts or reasons behind their award.[54]

It is clear from these decisions, which represent over thirty years of Supreme Court and federal circuit court precedent that issues of "substantive arbitrability" are for the court to decide, and questions of "procedural arbitrability," as defined in *John Wiley,* are for the arbitrator to decide.

Defining the subject matter for consideration by the district court and the arbitrator delineates their respective jurisdiction in the case. Thus, once a district court has completed its substantive arbitrability inquiry and ordered the parties to arbitration, Justice Brennan succinctly declared that the district court has "exhausted its function" and may not intervene again until a party objects to the arbitration award or seeks enforcement thereof.[55] As one Second Circuit district court remarked: there exists "no authority, statutory or case law, which empowers the district court to intervene in the

arbitration."[56] And that court further observed:

[T]he Federal Arbitration Act bestows limited powers upon the court. The court may get an arbitration under way by granting a § 4 petition; it may name arbitrators or fill vacancies in the panel, § 5; after the arbitration, it may confirm and award judgment upon it, § 9; and it may vacate an award for one of the grounds set forth in § 10.... It is sufficient to state for the present that the Federal Arbitration Act permits judicial intervention before the arbitration begins and after the award has been rendered. There is no statutory authority for judicial intervention during the course of arbitration proceedings, with the sole exception of a § 5 petition if there has been "a lapse ... in filling a vacancy" in the panel of arbitrators.[57]

The Second Circuit reaffirmed this language in *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* by declaring that the district court has "no plenary discretion" over the arbitration proceedings.[58]

Regardless of the foregoing case law, the district court in the instant case assumed that even after arbitration had been ordered and had begun[59] that it retained "plenary" jurisdiction over the course of the arbitration proceedings. The district court, believing that it was empowered to intervene and exercise discretionary control over the arbitration process, ordered that Glass's case be dismissed on the ground that Glass had been guilty of laches in proceeding to arbitration. The district court succinctly ordered:

1. The complaint in this action be dismissed on the ground of laches; and

2. The parties are directed not to proceed further with the arbitration of this matter

---

53. *Id.* at 203, 76 S.Ct. at 276.

54. *Id.* at 203–04, n. 4, 76 S.Ct. at 276 n. 4 (citations omitted).

55. *American Mfg.,* 363 U.S. at 571, 80 S.Ct. at 1364 (Brennan, J. concurring).

56. *Transportacion Maritima Mexicana, S.A. v. Companhia de Navegacao Lloyd Brasileiro,* 636 F.Supp. 474, 475 (S.D.N.Y.1983).

57. *Id.*

58. 761 F.2d 855, 857 (2d Cir.1985).

59. We believe that once a district court orders arbitration, the arbitration process has begun. Although the physical act of arbitration requires weeks or months for completion, the order to arbitrate shifts the parties' focus from litigation to arbitration.

before the American Arbitration Association.

By intervening into the administration of the arbitration process, however, the district court not only "usurp[ed] a function which [ ] is entrusted to the arbitration tribunal" [60] but also clearly contravened "the clear spirit of the [Act]." [61]

Defenses of laches, mere delay,[62] statute of limitations, and untimeliness constitute a broad category of waiver defenses that may be raised to defeat compelled arbitration. Laches, like its companion defenses, however, is a matter of "procedural arbitrability" solely for the arbitrators' decision and not for the court. Justice Brennan so held in *Operating Engineers v. Flair Builders, Inc.* [63]

In *Flair Builders*, there had been no contact between the parties from the time they signed their arbitration agreement in 1964 until the summer of 1968. At that point, Flair Builders objected to arbitration on the ground of *laches*, alleging:

> To require [it] to respond, through arbitration, to general charges of noncompliance with contract provisions allegedly beginning more than two years before this suit was filed would impose an extreme burden on its defense efforts.... [T]o compel arbitration would reward [the Union] for its own inaction and subject [Flair Builders] to the risk of liability because of actions taken or not taken in reliance on [the Union's] apparent abandonment.[64]

Unpersuaded by Flair Builders' plea, Justice Brennan held:

> [O]nce a court finds that ... the parties are subject to an agreement to arbitrate, and that agreement extends to "any difference" between them, then a claim that particular grievances are barred by laches is an arbitrable question under the agreement.... [And after] [h]aving agreed to the [arbitration] clause, the company is obliged to submit its laches defense ... to the arbitral process.[65]

We reached the same conclusion that laches is a question for the arbitrators in *In re Mercury Constr. Corp.*[66] Our holding to this effect was neither questioned by the petition for certiorari filed by the appellant, nor disturbed by the Supreme Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* In *Mercury*, the hospital alleged that Mercury Construction had failed to make a timely demand for arbitration and had therefore waived its right to arbitrate. We held that "any claim of untimeliness, waiver or laches ... is for the arbitrator and may not be an excuse for non-arbitrability." [67] Three years later, in *County of Durham v. Richards & Assocs.*, we reaffirmed our position that questions of limitations raised to defeat a motion to compel arbitration are for the arbitrator and not for the courts to decide.[68]

---

**60.** *American Mfg.*, 363 U.S. at 569, 80 S.Ct. at 1347.

**61.** *Transportacion*, 636 F.Supp. at 476.

**62.** The delay mentioned here bears no relation to the "default" a party may cite to contest a stay of litigation under section 3 of the Act. Although section 3 default may be considered by the district court, said default only encompasses the limited range of circumstances when a party seeking arbitration has "substantially utiliz[ed] the litigation machinery" before pursuing arbitration, and permitting the moving party to arbitrate would seriously "prejudice the party opposing the stay." *Maxum Foundations Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir.1985).

In the instant case, such "default" does not exist because neither party significantly participated in the litigation process. In fact both Glass and Kidder have been set on arbitrating their dispute since 1985. Furthermore, because Kidder initially moved for the section 3 stay of litigation in 1985, it cannot years later contest its own stay on the basis of delay.

**63.** 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972). Although *Flair Builders* reviews arbitration related to labor law, we believe the Supreme Court's position regarding defenses raised against arbitration is applicable to all arbitration cases.

**64.** *Id.* at 489, 92 S.Ct. at 1712.

**65.** *Id.* at 491–92, 92 S.Ct. at 1713.

**66.** 656 F.2d 933 (4th Cir.1981), *aff'd sub nom. Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

**67.** *Id.* at 942.

**68.** 742 F.2d 811, 815 (4th Cir.1984).

The decisions of the Second Circuit, which are preeminent in arbitration law, comport with our holdings. As early as 1952, District Judge Weinfeld wrote: "the issue of whether or not the statute of limitations is a bar to the proceeding, is, nevertheless, within the competence of the arbitrators." [69] In *Conticommodity Services, Inc. v. Philipp & Lion*,[70] the Second Circuit, drawing upon its earlier decision in *Trafalgar Shipping Co. v. International Milling Co.*,[71] ruled that "all questions of delay which relate to issues which the parties have agreed to submit to arbitration [are to] be resolved by the arbitrators, not the court." [72] In *Shearson Lehman Hutton, Inc. v. Wagoner*,[73] the Second Circuit declared that in *Conticommodity*, they had "emphatically [stated] that *any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators." [74]

It is clear, therefore, that under the Act, the district court is expressly limited to making only the pre-order determinations of identifying the arbitrable issues and reviewing the making and performance of the arbitration agreement. Questions regarding the arbitrability of an issue may not be revisited by the court. Additionally, the foregoing case law illustrates that questions of mere delay, laches, statute of limitations, and untimeliness raised to defeat the compelled arbitration are issues of procedural arbitrability exclusively reserved for resolution by the arbitrator. Kidder's plea of laches, therefore, cannot defeat the district court's order of arbitration.

Having stated the law of arbitration in this case, we now turn to the order of the district court.

### IV.

In the present case, the existence of a signed arbitration agreement and Kidder's refusal to arbitrate its controversy with Glass are both undisputed. Accordingly, the district court *should have* let the parties proceed to arbitration as ordered. Nonetheless, the district court intervened by ruling on the validity of the laches defense raised by Kidder in its motion to dismiss the cause from arbitration, or in the alternative, to limit the scope of arbitration.

The transcript of 1991 hearing reveals that all of the parties were confused about the proper role of the district court. After declaring his readiness to rule, the district judge addressed Kidder's counsel:

Before I rule, Mr. Lord what do you want? You want me to dismiss the complaint? You mean, enter an injunction against the arbitration? What do you want me to do?

Kidder's counsel first responded by disclaiming any intention to ask for injunctive relief, and, second, he stated that he thought "all that has to be done is that an order has to be entered dismissing the case [from arbitration]." To this, the district court ruled: "I am going to grant relief to Kidder...." Ironically, the district court then admitted that its ruling to terminate the arbitration was "extremely unusual" because (1) "[t]he last thing in the world a court ordinarily does is to enter orders which in effect prevent arbitration proceedings from going forward;" and (2) "certainly as a general proposition, defenses such as *laches* and things of that nature are considered by the arbitrators during the course of the arbitration hearing." The district court proceeded to justify its "unusual" ruling on the basis that this case was fundamentally different than the ordinary case because, "the court itself was present at the creation."

To say the court was "present at the creation" is a curious statement. What did the district court mean by "present at the cre-

**69.** *Application of Reconstruction Finance Corp.*, 106 F.Supp. 358, 362 (S.D.N.Y.1952).

**70.** 613 F.2d 1222 (2d Cir.1980).

**71.** 401 F.2d 568 (2d Cir.1968).

**72.** *Conticommodity*, 613 F.2d at 1226 (quotations omitted).

**73.** 944 F.2d 114 (2d Cir.1991).

**74.** *Id.* at 121.

ation?"[75] We find that the record neither factually nor legally supports this notion, because technically the parties' contract to arbitrate had been in existence since 1982, and when the district court replaced Judge Young, Count IX had already been identified by Judge Young and conceded by Kidder, as arbitrable. Furthermore, there is no support that "the court was present at the creation" when the district court entered another order of arbitration in 1988, or when it expanded—with the parties' consent—the scope of arbitration regarding Count IX. Hence, the district court's involvement fails to sanctify its decision to intervene at-will in the arbitration, review the doctrine of laches, and subsequently terminate the arbitration.

When faced with an arbitration case, the foregoing case law, which we reviewed, instructs that the district court's role is limited to determining whether the contract to arbitrate is valid and whether the dispute involved in the arbitration is within the subject matter of the contract to arbitrate. Once having made those determinations, the district court's role ends and the Act mandates that the district court enter an order of arbitration. The act of entering the order compelling the parties to arbitration, therefore, is ministerial in nature because as Justice Marshall wrote:

> By its terms, the Act leaves no place for the exercise of discretion by the district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.[76]

Moreover, contrary to the action of the district court, "laches," the ground on which the district court based its order of dismissal, is a matter to be decided by the arbitrators and not the court. The district court in this instance *improperly usurped a function of the arbitrators.*

Not only did the district court act improperly by reviewing the validity of Kidder's laches defense, its bench ruling was vague with respect to its finding of laches. The district court found laches to consist of two elements, excessive delay and prejudice. It fixed "excessive delay" in this case as the time period between the date it entered its order, August 22, 1988, and the "time" when the process of arbitration was to begin. Yet, the court never specified when arbitration was to begin, nor did it determine what act of the parties would indicate the start of arbitration. Additionally, the district court neither commented on whether there was delay in the arbitration while Judge Young presided over the case, nor did it review the record of the parties' cooperation in overcoming their impasse in progressing toward arbitration.

The district court was equally obtuse in its finding of prejudice, because it only said: "The prejudice [element] exists," without explaining what constituted the prejudice. The district court did, however, seem to imply that Kidder would be "prejudiced by the unavailability of the two representatives of Kidder responsible for the alleged fraudulent conduct," because they were apparently not available for trial. The district court commented:

> The fact that the matter is, if anybody could find them, what is the likelihood of having any reliable recollection of this broker or being able to find documented records of phone calls or transactions sheets or notes separate and apart from the monthly account statements, which—that would help build some sort of a persuasive testimony or documentary case in defense to this allegation on inside information.

Yet at the motion hearing, Kidder's counsel informed the court "we have never said we could not locate the broker." Accordingly, Kidder is responsible for keeping track of its witnesses' whereabouts and securing their testimony. Thus, whatever prejudice and delay that the district court attributed to the unavailability of the two witnesses cannot be assigned to Glass.

Finally, the district court revealed its *ratio decidendi* for granting the motion to dismiss

---

**75.** In 1969 former Secretary of State, Dean Acheson used the same phrase "Present at the Creation" in his memoirs. Dean Acheson, *Present At The Creation* (1969).

**76.** *Dean Witter,* 470 U.S at 218, 105 S.Ct. at 1241.

when it summarized: "The simple fact of the matter is it's just too long." This statement indicates that the district court injected a type of statute of limitations into the proceedings. Mere delay without actual prejudice to the party opposed to arbitration does not constitute waiver.[77] Hence, the district court also exceeded its authority by affixing an arbitrary time limitation to demands for arbitration that was neither authorized by the parties' arbitration agreement, nor incorporated into the district court's 1988 order of arbitration.

In the instant case, the arbitration panel's authority to resolve an issue regarding laches was inherent in the parties' broadly worded arbitration agreement. We hold that the district court exceeded its authority by entertaining Kidder's motion on laches, because in so doing, it disregarded the federal preference for arbitration and blatantly violated the rule that the question of laches is for the arbitrator and not the court. The conclusion we reach is in accord with the relevant case law of the Supreme Court,[78] our circuit,[79] and the Second Circuit.[80] Our holding comports with the general presumption favoring arbitration. Accordingly, the district court should have submitted Kidder's laches defense to arbitration for resolution in conjunction with Glass's Count IX allegations.

## V.

For the foregoing reasons, we reverse the district court's dismissal of Glass's remaining claims on laches, and remand with instructions that the proceedings below be stayed, and all disputes under Count IX, including Kidder's laches defense, be referred to arbitration.

*REVERSED AND REMANDED.*

---

**77.** *Maxum,* 779 F.2d at 981.

**78.** *Operating Engineers v. Flair Builders,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972).

**79.** *County of Durham v. Richards & Assocs.,* 742 F.2d 811 (4th Cir.1984); *In re Mercury Constr. Corp.,* 656 F.2d 933 (4th Cir.1981).

**80.** *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991); *Conticommodity Services, Inc. v. Philipp Lion,* 613 F.2d 1222 (2d Cir.1980); and *Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568 (2d Cir.1968).