# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
December 16, 2005 Session

## LOUISE SPANN ET AL. v. AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. ET AL.

**Appeal from the Circuit Court for Williamson County**
**No. 04011      Timothy Easter, Judge**

---

**No. M2004-02786-COA-R3-CV - Filed on August 30, 2006**

---

This appeal involves a dispute between a credit and charge card issuer and two cardholders regarding allegedly unauthorized charges to their accounts by entities affiliated with the issuer. The cardholders filed a class action complaint in the Circuit Court for Williamson County asserting that the practice of charging them for goods and services they did not agree to purchase constituted an unfair and deceptive trade practice prohibited by various state consumer protection laws and gave rise to causes of action for negligent and fraudulent misrepresentation, conversion, and unjust enrichment. The issuer and its affiliates filed a motion to compel separate arbitrations against each cardholder in accordance with the class arbitration waiver clause of the arbitration provision in the cardmember agreements. The cardholders conceded that they were required to arbitrate their claims but asked the trial court to strike the class arbitration waiver clause as unconscionable. Siding with the cardholders, the trial court struck the class arbitration waiver clause and granted the motion to compel arbitration. The issuer and its affiliates appealed. We have concluded that the trial court did not err by granting the motion to compel arbitration. However, we have also concluded that the trial court erred by finding the class arbitration waiver clause unconscionable under Utah law.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

J. Knox Walkup, Barbara J. Moss, Donna L. Roberts, Nashville, Tennessee; and Julia B. Strickland and Andrew W. Moritz, Los Angeles, California, for the appellants, American Express Travel Related Services Company, Inc., American Express Centurion Bank, and American Express Publishing Corporation.

George H. Nolan, Christopher E. Thorsen, and Jonathan D. Rose, Nashville, Tennessee, for the appellees, Louise Spann and Vetahmary Higgins.

**OPINION**

**I.**

American Express Company (AmEx), headquartered in New York City, is a diversified, global provider of financial services, including traveler's cheques, charge cards, and credit cards.[1]

Among its affiliated companies are: American Express Centurion Bank (AmEx Centurion), a Utah industrial loan corporation that issues American Express Optima credit cards; American Express Travel Related Services (AmEx Travel), a New York corporation that issues American Express charge cards; and American Express Publishing Corporation (AmEx Publishing), an AmEx Travel subsidiary located in New York that publishes luxury lifestyle magazines and provides other high-end services. AmEx Centurion, AmEx Travel, and AmEx Publishing (the "AmEx defendants") serve consumers throughout the United States.

In May 1994, Vetahmary Higgins, a retiree living in Hermitage, Tennessee, obtained an American Express charge card through AmEx Travel.[2] The card was governed by the 1994 "Cardmember Agreement" AmEx Travel sent to Ms. Higgins along with the card. The agreement provided that AmEx Travel had the "right to change this Agreement at any time," that it would notify Ms. Higgins in the event of any changes, and that it would "consider that you [i.e., Ms. Higgins] have accepted the changes if you keep or use the Card after we send our notice." The agreement stated that Ms. Higgins was free to reject any future changes in the agreement and to terminate her account. In the event Ms. Higgins elected to terminate her account, AmEx Travel agreed to refund a portion of her annual cardmember fee. Ms. Higgins would, however, remain responsible for all fees and charges incurred prior to that time.

In January 1998, Louise Spann, a retired teacher living in Brentwood, Tennessee, obtained an Optima credit card from AmEx Centurion. The card was governed by the 1997 "Cardmember Agreement." Like the cardmember agreement between Ms. Higgins and AmEx Travel, the agreement provided that AmEx Centurion could "change the terms of this Agreement at any time" and that AmEx Centurion would notify Ms. Spann of any changes. In addition, it designated Utah

---

[1]The United States District Court for the Southern District of New York has recently provided the following cogent and concise explanation of the distinction between charge cards and credit cards:

> A charge card requires its holder to pay the full outstanding balance at the end of a standard billing cycle. A credit card, by contrast, allows the cardholder to pay a portion of the amount owing at the close of a billing cycle, subject to interest charges. In plain terms, the credit card is a means of financing purchases, [while] the charge card is a method of payment.

*In re Am. Express Merchs. Litig.*, No. 03 CV 9592(GBD), 2006 WL 662341, at *1 n.6 (S.D.N.Y. Mar. 16, 2006).

[2]Ms. Higgins recalls that she has had an American Express charge card for thirty years, a fact the AmEx defendants deny. The parties' factual dispute regarding how long Ms. Higgins has possessed an American Express charge card has no bearing on this appeal.

law as the substantive law governing the cardmember agreement and Ms. Spann's account. Neither the 1994 cardmember agreement AmEx Travel sent to Ms. Higgins nor the 1997 cardmember agreement AmEx Centurion sent to Ms. Spann contained an arbitration provision. In 1998, AmEx Travel unilaterally assigned Ms. Higgins's cardmember agreement to AmEx Centurion as allowed by the express terms of the 1994 cardmember agreement. As a result, Utah law governs both cardmember agreements.

In April 1999, AmEx Centurion unilaterally amended Ms. Higgins's and Ms. Spann's cardmember agreements to include an arbitration provision with a class arbitration waiver clause. Ms. Higgins and Ms. Spann were notified of the amendment by means of a ten-page mailer titled "F.Y.I." in large lettering on the front page beside the following caption: "A Summary of Changes to Agreements and Benefits." The front page of the mailer stated its purpose as follows:

> *F.Y.I. (For Your Information)* is an update that notifies you of changes to your Cardmember Agreement and provides you with other important notices. Please take a moment to look over this document carefully before you file it away in a safe place. . . . ***All changes go into effect June 1, 1999, except where otherwise noted.***

The front page of the mailer also contained a summary of the changes detailed in the mailer, though in a much smaller font than the preceding information.[3] The first listed change concerned the addition of an arbitration provision to the cardmember agreements and was set apart from the rest of the text on the front page in a black box with white lettering as follows:

> Arbitration Provision
> We are changing the Cardmember Agreement to include an Arbitration Provision. This Provision may affect your right to go to court or to have a jury trial. It is important that you carefully read the Provision in its entirety.

A detailed, ten-paragraph arbitration provision that included a clause barring class or consolidated arbitration proceedings appeared on the second page.

One year later, AmEx Centurion unilaterally amended the arbitration provision to make it more equitable to cardholders in response to court decisions striking down other arbitration provisions as unconscionable based on features similar to those contained in the arbitration provision

_____

[3]We note that the font of most of the text in the mailers contained in the record on appeal is incredibly small and seems ill designed to provide cardholders with notice of information that they are expected to actually read. However, with magnifying glass in hand, the court has been able to decipher the contents of the AmEx defendants' mailers. Because Ms. Spann and Ms. Higgins have not specifically raised the issue in their brief on appeal, we express no opinion regarding the potential legal effect on the issue of procedural unconscionability of the use of such minuscule script in a document ostensibly designed to provide "notice" to large numbers of consumers whose eyesight, it can be assumed, falls over a wide range of acuity.

in its cardmember agreements with Ms. Higgins and Ms. Spann. AmEx Centurion did not, however, remove the clause barring class arbitration. Ms. Spann and Ms. Higgins learned of the changes to the arbitration provision through F.Y.I. mailers sent out in March and September 2000 respectively. In 2003, AmEx Centurion sent Ms. Higgins and Ms. Spann updated cardmember agreements incorporating the 1999 and 2000 changes, and the parties agree that the 2003 versions of the cardmember agreements govern the issues involved on appeal.

The arbitration provision in the 2003 cardmember agreements acknowledges that it arises out of a "transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act." It directs the arbitrator to "apply applicable substantive law consistent with the FAA and applicable statutes of limitations." In addition, the arbitrator, "at the timely request of either party, shall provide a brief written explanation of the basis for the decision." The separate choice-of-law provision in the cardmember agreements states that "[t]his Agreement and your Account, and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah (without regard to internal principles of conflicts of law), and by applicable federal law."

The arbitration provision applies broadly to "any claim, dispute or controversy . . . arising from or relating to your Account, this Agreement, . . . and any other related or prior agreement . . . , or the relationships resulting from any of the above agreements . . . , including the validity, enforceability or scope of this Arbitration Provision or the Agreements." The term "'Claim' includes claims of every kind and nature, including but not limited to . . . claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity" and "is to be given the broadest possible meaning that will be enforced."

Either party has the right to demand arbitration of any claim, although AmEx Centurion has agreed not to demand arbitration for individual claims filed properly in state or municipal small claims courts. The cardholder has the right to determine which of the three major national arbitration organizations[4] will conduct the arbitration, regardless of which party demands that the claim be arbitrated. All hearings to be attended by the cardholder must take place in the federal judicial district in which the cardholder resides. Moreover, regardless of which party prevails in the arbitration, AmEx Centurion is required to pay all filing, administrative, and hearing fees in excess of what the cardholder would have paid had he or she pursued the claim in a state or federal court rather than in arbitration.

The arbitration provision describes its own importance as follows:

> *Significance of Arbitration*: IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO

---

[4]The arbitration provision lists the following three arbitration organizations along with their contact information: the American Arbitration Association (AAA), the Judicial Arbitration and Mediation Service (JAMS), and the National Arbitration Forum (NAF).

HAVE THEIR [sic] CLAIMS RESOLVED EXCEPT AS PROVIDED FOR IN THE CODE OF PROCEDURES OF THE NAF, JAMS OR AAA, AS APPLICABLE (THE "CODE"). FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU OR WE WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

Immediately after this paragraph, the following class arbitration waiver clause appears:

*Restrictions on Arbitration*: If either party elects to resolve a Claim by arbitration, that Claim shall be arbitrated on an individual basis. *There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated.* The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, Claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties.

When Ms. Spann received her May 2003 statement, she noticed a $39 charge for a subscription to TRAVEL+LEISURE MAGAZINE and a $29 charge for a subscription to FOOD & WINE MAGAZINE, neither of which she had ordered. Similarly, Ms. Higgins's October 2003 statement reflected a $79 charge for a membership in the "Travel+Leisure Golf Club" even though Ms. Higgins is not a golfer and had not agreed to purchase this membership. Unauthorized charges appeared on Ms. Spann's and Ms. Higgins's statements again in November 2003. Ms. Spann was charged $30.90 for a TRAVEL+LEISURE COOKBOOK, while Ms. Higgins was assessed $59.95 for a membership in the "Connoisseur Club."

On January 2, 2004, Ms. Spann filed a class action complaint against the AmEx defendants in the Circuit Court for Williamson County. She claimed that the manner in which the AmEx defendants marketed and sold goods and services to AmEx Centurion's customers violated the Tennessee Consumer Protection Act of 1977 and other states' unfair and deceptive trade practices statutes. She also claimed that the AmEx defendants' actions and their results amounted to intentional and negligent misrepresentation, conversion, and unjust enrichment. Ms. Spann sought to recover actual and punitive damages. Two weeks later, on January 15, 2005, Ms. Spann filed an amended complaint adding Ms. Higgins as an additional named plaintiff.

On March 22, 2004, the AmEx defendants filed a motion to compel separate arbitrations for Ms. Spann's and Ms. Higgins's claims based on the arbitration provision in the cardholder agreements. In their April 28, 2004 response, Ms. Spann and Ms. Higgins conceded that their claims against the AmEx defendants were subject to arbitration because of the arbitration provision of the cardmember agreements but insisted that the class arbitration waiver clause was unconscionable. Following a May 17, 2004 hearing, the trial court issued a June 29, 2004 memorandum opinion finding that Ms. Spann's and Ms. Higgins's claims were subject to arbitration under the arbitration provision of the cardmember agreements. Applying its understanding of Utah law, the trial court also found that the class arbitration waiver clause was unenforceable because it was both substantively and procedurally unconscionable.[5] Accordingly, on July 9, 2004, the trial court entered an order striking the class arbitration waiver clause from the arbitration provision in the cardmember agreements and directing that the dispute be referred to AAA as a "potential class action."[6] Thereafter, on October 27, 2004, the court denied the AmEx defendants' Tenn. R. Civ. P. 59.04 motion but granted their motion for a stay pending appeal.

The AmEx defendants filed a timely notice of appeal and, with the trial court's permission, also filed an application for permission to pursue an interlocutory appeal. On February 4, 2005, this court entered two orders concluding that the trial court's July 9, 2004 order was final and appealable under Tenn. R. Civ. P. 3 and that a Tenn. R. App. P. 9 interlocutory appeal was therefore unnecessary.[7]

## II.
### THE STANDARDS OF REVIEW

The standards this court uses to review the results of bench trials are well settled. With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462,

---

[5]The trial court concluded its memorandum opinion by noting:

> The court is not concluding that in all situations the provision should be stricken. Indeed, arbitration and the rules that govern it are highly favored under all controlling authority, including Tennessee and Utah. However, for this Court to turn its head to rights the plaintiffs would otherwise be able to pursue in the constitutional system in which they enjoy privilege (the judicial system), and require the plaintiffs to submit their claims to a procedure dictated by the Defendants, is just not the right thing to do.

[6]Prior to the entry of the July 9, 2004 order, the parties informed the trial court that AAA had been selected to arbitrate the disputes.

[7]*Spann v. Am. Express Travel Related Servs. Co.*, No. M2004-02681-COA-R9-CV (Tenn. Ct. App. Feb. 4, 2005) (order denying Tenn. R. App. P. 9 application); *Spann v. Am. Express Travel Related Servs. Co.*, No. M2004-02786-COA-R3-CV (Tenn. Ct. App. Feb. 4, 2005) (order denying motion to dismiss appeal).

465 (Tenn. Ct. App. 2000). If, however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Reviewing findings of fact under Tenn. R. App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). The prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Props. v. Maury County*, 70 S.W.3d at 742. Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 60 S.W.3d 65, 71 (Tenn. Ct. App. 2001); *Placencia v. Placencia*, 48 S.W.3d 732, 734 (Tenn. Ct. App. 2000). The trial court's conclusion that the class arbitration waiver clause is unconscionable is a question of law that we will review de novo without a presumption of correctness.

### III.
#### THE PROPER DECISION-MAKER: COURT OR ARBITRATOR?

Before turning to the parties' main arguments on appeal, we must first address a threshold matter. Following the oral argument in this appeal, the United States Supreme Court issued a decision on February 21, 2006 in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. ___, 126 S. Ct. 1204 (2006), a case involving a challenge to the enforceability of an arbitration provision based on another clause in the contract that allegedly rendered the entire agreement illegal and void *ab initio*. The Court reaffirmed the principles that an agreement to arbitrate contained in a larger contract is severable from the remainder of the contract as a matter of federal substantive law and that a challenge to an arbitration provision based on the alleged illegality of the entire contract must be decided in the first instance by an arbitrator rather than a court. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. at ___, 126 S. Ct. at 1209; *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806 (1967).

Both before and after the decision, legal commentators suggested that *Buckeye Check Cashing, Inc. v. Cardegna* would or had shed new light on whether a court or an arbitrator was the proper decision-maker for a challenge to the enforcement of an arbitration provision on the ground that it is unconscionable under state contract law.[8] Less than a month after the decision, the United States District Court for the Southern District of New York relied on it to support its holding that an arbitrator, not a court, should decide an unconscionability challenge to the class arbitration waiver clause contained in AmEx Travel's standard merchant agreements. *In re Am. Express Merchs. Litig.*, 2006 WL 662341, at *6. In light of the Supreme Court's post-oral argument decision in *Buckeye*, the prior and subsequent legal commentary, and the Southern District of New York's application of the decision to a closely analogous provision, we invited the parties to provide supplemental briefing addressing the impact of the Supreme Court's decision on the present appeal.

This appeal involves a class arbitration waiver clause in cardmember agreements, not merchant agreements. The cardmember agreements expressly provide that challenges to the enforceability of the arbitration provision are claims subject to arbitration at the election of either party, and the parties have selected to resolve their disputes primarily through arbitration rather than litigation. Thus, the plain language of the cardmember agreements suggests that Ms. Spann's and Ms. Higgins's challenge to the enforceability of the class arbitration waiver clause should be decided by an arbitrator rather than the courts in the first instance. However, in their supplemental briefs,[9] both sides stated expressly and unequivocally that they did not intend to arbitrate the validity of the class arbitration waiver clause and that at this point in the litigation, they would prefer to have the unconscionability challenge to the class arbitration waiver clause resolved by the courts rather than an arbitrator.[10] Thus, any argument either side might have had that the trial court should have deferred the challenge to the class arbitration waiver clause to an arbitrator has been expressly waived, and we therefore need not address it further.

## IV.
### ENFORCEABILITY OF THE CLASS ARBITRATION WAIVER CLAUSE

The AmEx defendants take issue with the trial court's conclusion that the class arbitration waiver clause in the cardmember agreements is substantively and procedurally unconscionable under

---

[8]*See, e.g.*, Myriam Gilles, *Opting Out of Liability: the Forthcoming, Near-Total Demise of the Modern Class Action*, 104 MICH. L. REV. 373, 403-04 (2005) ("So while the *Buckeye* controversy seems to revolve around a fairly narrow doctrinal question – whether the FAA preempts state courts from entertaining illegality challenges to contracts containing arbitration clauses – there would seem to be no principled reason why *Buckeye* would not also govern the issue of who decides whether an arbitration clause is unconscionable under state contract law.") (Gilles, *Opting Out of Liability*); JAMES E. MCGUIRE, 1 ALTERNATIVE DISPUTE RESOLUTION PRACTICE GUIDE § 15:7 (2006) ("Though the opinion does not disclose whether the arbitration clause also contained a class action waiver, the reasoning of *Buckeye* would lead ineluctably to deferring any challenge to such a clause to the arbitrator, provided only that the arbitration clause itself was valid and severable.").

[9]This court greatly appreciates the well researched and informative supplemental briefs prepared by the parties.

[10]The AmEx defendants explained that they no longer included in their form cardmember agreements the phrase expressly extending the definition of claims to include challenges to the enforceability of the arbitration provision itself.

the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16 (West 1999 & Supp. 2006) (FAA), as supplemented by Utah contract law. In response, Ms. Spann and Ms. Higgins acknowledge that the FAA and Utah contract law provided the governing law for this appeal but contend that the trial court correctly applied them in striking the class arbitration waiver clause from the cardmember agreements. Accordingly, we turn now to an examination of the FAA and Utah contract law to determine whether the trial court erred in concluding that the class arbitration waiver clause was unconscionable as a matter of state law and hence unenforceable.

## A.
## The Federal Arbitration Act

Congress enacted the FAA (originally named the "United States Arbitration Act") in 1925 and reenacted and codified it in 1947.[11] Modeled after New York State's arbitration statute,[12] the FAA requires courts to enforce written agreements to arbitrate in contracts affecting interstate commerce "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. With the enactment of the FAA, Congress decreed a liberal policy favoring the enforcement of written agreements to arbitrate commercial disputes applicable nationwide. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625, 105 S. Ct. 3346, 3353 (1985); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983).

In enacting the FAA, Congress relied on the full scope of its vast power over interstate commerce. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834, 839 (1995); *Perry v. Thomas*, 482 U.S. 483, 490, 107 S. Ct. 2520, 2526 (1987) (holding that FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause").[13] Accordingly, the FAA preempts state law that conflicts with its aims, *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477-78, 109 S. Ct. 1248, 1255 (1989); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56, 115 S. Ct. 1212, 1215 (1995), and it binds state and federal judges alike, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. at 271-72, 115 S. Ct. at 838; *Southland Corp. v. Keating,* 465 U.S. at 11-14, 104 S. Ct. at 859-60.[14]

---

[11]Act of February 12, 1925, Pub. L. No. 68-401, §§ 1-15, 43 Stat. 883, 883-86; Act of July 30, 1947, Pub. L. No. 80-282, § 1, 61 Stat. 669, 669-74.

[12]*See Southland Corp. v. Keating*, 465 U.S. 1, 25 n.8, 104 S. Ct. 852, 866 n.8 (1984) (O'Connor, J., dissenting); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. at 421 & n.25, 87 S. Ct. at 1815 & n.25 (Black, J., dissenting).

[13]The Commerce Clause provides in relevant part as follows: "The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3.

[14]The Supremacy Clause provides in relevant part as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. IV, cl. 2.

Congress enacted the FAA to reverse literally centuries of Anglo-American common law denying specific enforcement of agreements to arbitrate. *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S. Ct. 754, 761 (2002); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 & n.4, 94 S. Ct. 2449, 2453 & n.4 (1974); *see also Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 120-21, 44 S. Ct. 274, 276 (1924) (noting in the year before the FAA was enacted that "[t]he federal courts–like those of the states and of England–have, both in equity and at law, denied, in large measure, the aid of their processes to those seeking to enforce executory agreements to arbitrate disputes. They have declined to compel specific performance, or to stay proceedings on the original cause of action.") (citations omitted). The goal was to protect and foster the national economy by enabling contracting parties to enter into enforceable agreements to have commercial disputes resolved by arbitration, a process that often allows parties to obtain quicker and more cost-effective relief than they could obtain in courts of law. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220-21, 105 S. Ct. 1238, 1242 (1985); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. at 404, 87 S. Ct. at 1806.[15]

---

[15]Unlike the contemporary English arbitration statute, the FAA allowed (and still allows) parties to select arbitration for questions of both fact and law. *See Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 n.4, 76 S. Ct. 273, 276 n.4 (1956); *Wilko v. Swan*, 346 U.S. 427, 436-37, 74 S. Ct. 182, 187-88 (1953), *overruled on other grounds by Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 485, 109 S. Ct. 1917, 1922 (1989); *cf. Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L. Ed. 96, 99 (1854) ("Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. . . . If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation.").

In an early case construing the FAA, the United States Supreme Court offered the following explanation for Congress's decision to allow private parties to agree to have questions of both fact and law decided by private arbitrators:

> Congress has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration if the parties are willing to accept less certainty of legally correct adjustment.

*Wilko v. Swan*, 346 U.S. at 438, 74 S. Ct. at 188. Justice Stevens has described the FAA's arbitration regime in less charitable terms:

> Arbitration awards are only reviewable for manifest disregard of the law, and the rudimentary procedures which make arbitration so desirable in the context of a private dispute often mean that the record is so inadequate that the arbitrator's decision is virtually unreviewable. Despotic decisionmaking of this kind is fine for parties who are willing to agree in advance to settle for a best approximation of the correct result in order to resolve quickly and inexpensively any contractual dispute that may arise in an ongoing commercial relationship. Such informality, however, is simply unacceptable when every error may have devastating consequences for important businesses in our national economy and may undermine their ability to compete in world markets.

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. at 656-57, 105 S. Ct. at 3369 (Stevens, J., dissenting) (citation and footnote omitted).

Nevertheless, under the FAA, arbitration remains "a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. at 479, 109 S. Ct. at 1256. Thus, the courts will not "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. at 294, 122 S. Ct. at 764; *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. at 57, 115 S. Ct. at 1216 ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties."). Accordingly, the contracting parties are free to limit the issues subject to arbitration, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. at 628, 105 S. Ct. at 3355, and may specify in their agreement the rules by which any arbitration will be conducted, *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. at 479, 109 S. Ct. at 1256.

The FAA restricts the states' traditional power to regulate and even prohibit the enforcement of private contacts on a prospective basis. *Southland Corp. v. Keating*, 465 U.S. at 10, 104 S. Ct. at 858. It does not, however, leave the states totally powerless to protect their own citizens and others within their jurisdiction from the enforcement of all written arbitration agreements, no matter how unjust or contrary to a state's public policy. The FAA allows states to deny enforcement to arbitration agreements on "such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C.A. § 2, including the defenses of laches, estoppel, waiver, fraud, duress, and unconscionability, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84-85, 123 S. Ct. 588, 592 (2002); *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656 (1996). The FAA simply prevents states from singling out arbitration contracts and clauses for disfavored treatment. *Doctor's Assocs. v. Casarotto*, 517 U.S. at 687, 116 S. Ct. at 1656; *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. at 281, 115 S. Ct. at 843 ("What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause.").

The trial court struck the class arbitration waiver clause from the arbitration provision in the cardmember agreements on the ground that it is unconscionable. Unconscionability is a well established defense to the enforcement of contracts and contractual provisions under Utah law. *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 461 (Utah 1983) ("This Court has long held that unconscionable provisions of contracts are unenforceable. Other courts have done likewise.") (citations omitted); *see, e.g.*, *Christensen v. Colo. Inv. Loan Co.*, 91 P. 581, 583 (Utah 1907); *Sawtelle v. N. Am. Sav., Loan & Bldg. Co.*, 48 P. 211, 212 (Utah 1897). Thus, assuming the trial court's application of Utah contract law was correct, its decision to strike the class arbitration waiver clause did not contravene the FAA's command that courts enforce written agreements to arbitrate commercial disputes "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. Accordingly, we turn next to an examination of Utah's doctrine of unconscionability.

-11-

**B.**
**Utah Contract Law**

The parties agree that the trial court properly decided to apply Utah contract law in determining whether the doctrine of unconscionability renders the class arbitration waiver clause in the cardmember agreements unenforceable. *Deaton v. Vise*, 186 Tenn. 364, 373, 210 S.W.2d 665, 668-69 (1948); *Solomon v. FloWarr Mgmt., Inc.*, 777 S.W.2d 701, 705 n.5 (Tenn. Ct. App. 1989).[16] In deciding whether the trial court erred in finding the class arbitration waiver clause unenforceable, we do not look first to Tennessee contract law and then seek to determine whether any available Utah authority suggests that Utah's doctrine of unconscionability differs from that of Tennessee. Instead, we must analyze Ms. Spann's and Ms. Higgins's challenge to the enforceability of the class arbitration waiver clause as though we were judges sitting on a state court in Utah. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998); *Four Seasons Gardening & Landscaping, Inc. v. Crouch*, 688 S.W.2d 439, 442 (Tenn. Ct. App. 1984). Thus, Tennessee law has no direct bearing on the central issue on appeal.

The parties have pointed us to no Utah state court case or other authority directly addressing the enforceability of a class arbitration waiver clause in an arbitration agreement, and our own research has uncovered none. Accordingly, we must examine Utah's treatment of the doctrine of unconscionability generally to determine whether the trial court erred in finding the class arbitration waiver clause unconscionable and thus unenforceable. *Cf. Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d at 5; *see also Discover Bank v. Superior Court*, 113 P.3d 1100, 1120 (Cal. 2005) (Baxter, J., concurring in part and dissenting in part) ("States may, of course, differ in their conception of what constitutes an unconscionable contract term.").

The Utah courts take a restrictive view of the doctrine of unconscionability. In Utah, contracting parties are allowed to contract freely, *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1040 (Utah 1985); *Peck v. Judd*, 326 P.2d 712, 717 (Utah 1958), deciding for themselves the terms of the deal and the proper allocation of the risks between them, *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998); *see also Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1043 ("[V]irtually all contracts involve the assessment of risks."). Utah law permits parties to enter into contracts that later appear to be unreasonable, *Woodhaven Apts. v. Washington*, 942 P.2d 918, 924 (Utah 1997); *Park Valley Corp. v. Bagley*, 635 P.2d 65, 67 (Utah 1981), as well as contracts that place hardships on only one of the parties, *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402; *Fleming v. Fleming-Felt Co.*, 323 P.2d 712, 716 (Utah 1958). The Utah courts do not indulge the paternalistic view that it is their role to relieve parties to arm's length

---

[16]*See also* Restatement (Second) of Conflict of Laws § 187 cmt. b, at 562 (1971) (In deciding whether a choice-of-law provision should not be given effect because it was procured by improper means, "[a] factor which the forum may consider is whether the choice-of-law provision is contained in an 'adhesion' contract, namely one that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms. Such contracts are usually prepared in printed form, and frequently at least some of their provisions are in extremely small print. . . . Choice-of-law provisions contained in such contracts are usually respected.").

transactions from their poor judgment in entering into bad agreements. *Johnston v. Austin*, 748 P.2d 1084, 1089 (Utah 1988); *Carlson v. Hamilton*, 332 P.2d 989, 990 (Utah 1958).

Nevertheless, Utah law's solicitude toward the enforcement of private contracts "has its limits," *Bekins Bar V Ranch v. Huth*, 664 P.2d at 459, and a Utah court will not allow itself to become a party to the enforcement of a contract or contractual provision that is "flagrantly unjust," *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1040. Thus, it is an established rule under Utah law that a court may, on equitable grounds, refuse to enforce a contract or contractual provision that is unconscionable in whole or in part. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402; *Bekins Bar V Ranch v. Huth*, 664 P.2d at 459. The Utah Supreme Court has repeatedly cautioned that a party seeking to defeat the enforcement of a contract or contractual provision based on Utah's doctrine of unconscionability faces an uphill battle. *See, e.g.*, *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402 ("A party claiming unconscionability bears a heavy burden."); *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1041 ("[T]he standard for determining unconscionability is high, even if not precise.").

"Unconscionable" is a term that "defies precise definition" under Utah law. *Woodhaven Apts. v. Washington*, 942 P.2d at 924; *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1041. However, it has generally been understood to include "an absence of meaningful choice on the part of one of the parties *together with contract terms which are unreasonably favorable to the other party.*" *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402; *accord Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1042. Thus, Utah courts employ a two-part analysis to decide whether a contract or contractual provision is unconscionable. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402; *Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996). The first prong, substantive unconscionability, involves an inquiry into the fairness of the contract's terms, *Sosa v. Paulos*, 924 P.2d at 360; *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1041, while the second prong, procedural unconscionability, focuses on the relative bargaining power of the contracting parties and the circumstances surrounding the formation of the contract, *Wade v. Jobe*, 818 P.2d 1006, 1017 (Utah 1991); *Bekins Bar V Ranch v. Huth*, 664 P.2d at 462.

While substantive unconscionability alone may render a contract or contractual provision unenforceable under Utah law, "procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable." *Dan's Food Stores, Inc.*, 972 P.2d at 402; *see also Sosa v. Paulos*, 924 P.2d at 361 ("While it is conceivable that a contract might be unconscionable on the theory of procedural unconscionability without any substantive imbalance in the obligations of the parties to the contract, that would be rare.") (quoting *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1043). In deciding whether a party has established a defense of unconscionability, "a court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise." *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1041; *accord Dan's Food Stores, Inc.*, 972 P.2d at 402.

**1.**
**Substantive Unconscionability**

Ms. Spann and Ms. Higgins do not contend that the arbitration provision or the cardmember agreements as a whole are substantively unconscionable. Instead, they claim only that the class arbitration waiver clause within the arbitration provision contained in the cardmember agreements is unconscionable. In other words, it is Ms. Spann's and Ms. Higgins's position that under Utah contract law, class arbitration waiver clauses are per se substantively unconscionable. We disagree.

Substantive unconscionability focuses on the contents of the contract and the "relative fairness of the obligations assumed." *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1041; *accord Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402. The question is whether "a contract's terms are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain according to the mores and business practices of the time and place." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 402; *accord Sosa v. Paulos*, 924 P.2d at 361. A contract is not rendered unconscionable because a single term is unreasonable or advantages one party over another. *Dan's Food Stores, Inc.*, 972 P.2d at 402; *Sosa v. Paulos*, 924 P.2d at 362. Substantive unconscionability requires a "disparity that is so great as to shock the conscience." *Woodhaven Apts. v. Washington*, 942 P.2d at 925; *accord Jacobson v. Swan*, 278 P.2d 294, 298 (Utah 1954). As the Utah Supreme Court has explained:

> It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*Carlson v. Hamilton*, 332 P.2d at 991; *accord Woodhaven Apts. v. Washington*, 942 P.2d at 925.

Even though the Utah courts have not yet addressed whether class arbitration waiver clauses are inherently unconscionable, we fail to see how the enforcement of the class arbitration waiver clause against Ms. Spann and Ms. Higgins would result in a situation so oppressive as to "shock the conscience" or leave all "decent, fair-minded" people with a "profound sense of injustice." *Woodhaven Apts. v. Washington*, 942 P.2d at 925. The class arbitration waiver clause does not exculpate the AmEx defendants for any potential wrongdoing, nor does it purport to preclude Ms. Spann and Ms. Higgins from seeking recovery against the AmEx defendants for any contractual or statutory violations they might have committed. It simply requires Ms. Spann and Ms. Higgins to resolve their own claims against the AmEx defendants individually rather than as representatives of both themselves and others. There is nothing particularly shocking about requiring Ms. Spann and Ms. Higgins to resolve their claims against the AmEx defendants on an individual basis.

Ms. Spann and Ms. Higgins urge us to find that the class arbitration waiver clause is unconscionable based on decisions from the courts of other states. However, with the exception of

courts sitting in California, the vast majority of state and federal courts that have considered the question have rejected the argument that class action and class arbitration waiver clauses are unconscionable per se. Gilles, *Opting Out of Liability*, 104 Mich. L. Rev. at 400; *see generally* Alan S. Kaplinsky & Mark J. Levin, *Consensus or Conflict? Most (But Not All) Courts Enforce Express Class Action Waivers in Consumer Arbitration Agreements*, 60 BUS. LAW. 775 (2005).[17] A recent decision by the New Jersey Supreme Court that Ms. Spann and Ms. Higgins called to our attention in a Tenn. R. App. P. 27(d) statement of supplemental authorities is not to the contrary. There, the court struck down the particular class arbitration waiver clause at issue but stated clearly that it was not holding that class arbitration waiver clauses are unconscionable per se under New Jersey contract law. *Muhammad v. County Bank of Rehoboth Beach, Del.*, ___ A.2d ___, No. A-39 September Term 2005, 2006 WL 2273448, at *10 (N.J. Aug. 9, 2006).[18] Moreover, just last year, the California Supreme Court issued an opinion strongly suggesting that the California courts' aversion to the enforcement of class arbitration waiver clauses may be on the wane, at least outside the field of consumer contracts. *Discover Bank v. Superior Court*, 113 P.3d at 1110.

Ms. Spann and Ms. Higgins have pointed us to nothing in the decisions of the Utah courts to suggest they would decline to follow the overwhelming majority view on this issue. We decline to stake out a fringe position for the Utah courts on this question, especially in light of the Utah Supreme Court's repeated admonitions regarding the difficulty contracting parties face in attempting to defeat the enforcement of a contract or contractual provision based on Utah's doctrine of unconscionability. Accordingly, the trial court erred in concluding that the class arbitration waiver clause in Ms. Spann's and Ms. Higgins's cardmember agreements is substantively unconscionable under Utah law.

## 2.
## Procedural Unconscionability

Procedural unconscionability focuses on the manner in which the contract or provision at issue was entered into and the relative bargaining power of the contracting parties. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 403; *Sosa v. Paulos*, 924 P.2d at 362. The question is whether there was "overreaching by a contracting party occupying an unfairly superior bargaining position." *Ryan*

---

[17]*See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32, 111 S. Ct. 1647, 1655 (1991) (upholding enforceability of arbitration provision under FAA in spite of the fact that class arbitration might be unavailable in the arbitration forum selected in the contract); *Pick v. Discover Fin. Servs., Inc.*, No. Civ. A. 00-935-SLR, 2001 WL 1180278, at *5 (D. Del. Sept. 28, 2001) ("[I]t is generally accepted that arbitration clauses are not unconscionable because they preclude class actions."); *Lomax v. Woodmen of the World Life Ins. Society*, 228 F. Supp. 2d 1360, 1365 (N.D. Ga. 2002) ("Defendant's arbitration clause requires that all claims be decided individually and precludes class-wide arbitration. Generally, prohibiting class-wide arbitration does not render an otherwise valid arbitration clause unconscionable.").

[18]In a companion case released the same day as *Muhammad v. County Bank of Rehoboth Beach, Del.* but for some reason not mentioned or included in Ms. Spann's and Ms. Higgins's statement of supplemental authorities, the New Jersey Supreme Court held affirmatively that "under New Jersey law, [a] class-arbitration waiver in [an] arbitration agreement is not unconscionable per se." *Delta Funding Corp. v. Harris*, ___ A.2d ___, No. A-44 September Term 2005, 2006 WL 2277984, at *7 (N.J. Aug. 9, 2006).

*v. Dan's Food Stores, Inc.*, 972 P.2d at 403; *accord Bekins Bar V Ranch v. Huth*, 664 P.2d at 462. The Utah courts are guided in this inquiry by consideration of the following non-exclusive list of factors:

> (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 403 (quoting *Sosa v. Paulos*, 924 P.2d at 362); *see also Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1042; *Bekins Bar V Ranch v. Huth*, 664 P.2d at 461-62. No one factor is dispositive, and the determination regarding procedural unconscionability must be made in light of the doctrine of unconscionability's basic purpose to prevent oppression and unfair surprise. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 403; *Sosa v. Paulos*, 924 P.2d at 362.

The first, fourth, and sixth factors militate against the trial court's finding of procedural unconscionability. Ms. Spann and Ms. Higgins received the F.Y.I. mailer adding the arbitration provision with the class arbitration waiver clause to the cardmember agreements in April 1999. The disputed charges did not begin appearing on their statements until May and October 2003. The intervening four years provided Ms. Spann and Ms. Higgins with more than ample time to review the amendments to the cardmember agreements and decide whether they wished to terminate their accounts rather than accede to the requirement that they pursue their claims against the AmEx defendants individually in the event either side elected to resolve a dispute by arbitration. Moreover, the class arbitration waiver clause is written in plain English and requires no explanation beyond that contained in the amendments to the cardmember agreements, and Ms. Spann and Ms. Higgins do not contend that they sought but were refused a simpler or more detailed explanation of the class arbitration waiver clause prior to initiating the present lawsuit. Finally, there is no suggestion in the record that the AmEx defendants employed deception in an attempt to obscure the existence or meaning of the class arbitration waiver clause.

In light of the Utah Supreme Court's decision in *Ryan v. Dan's Food Stores, Inc.*, we conclude that the fifth factor also militates against the trial court's finding of procedural unconscionability. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 403-04. James Ryan began working for Dan's Food Stores, Inc. as a part-time pharmacist in 1992. The following year, he applied for and received a job as a full-time pharmacist. The company provided him with an employee handbook and told him that he would have to read the handbook and sign and return an acknowledgment form before receiving his next paycheck. While he was concerned about the employee handbook's statement that "Your employment at Dan's is at will and may be terminated

without cause or prior notice by either you or Dan's," he understood the provision, signed the acknowledgment form, and returned it to his employer.

In 1995, the company terminated Mr. Ryan as a result of numerous customer complaints. Mr. Ryan filed suit for wrongful termination, and the trial court granted summary judgment in favor of the employer in part because of Mr. Ryan's status as an at-will employee. On appeal, Mr. Ryan claimed that the form acknowledging that he had read and understood the employee handbook with its statement regarding at-will employment was unconscionable. He claimed that he was in an inferior bargaining position because he was already an employee of the company when he was instructed to sign the acknowledgment form, he had to sign the form to keep his job, and the company refused to give him his paycheck for wages previously earned if he did not sign it.

The Utah Supreme Court rejected Mr. Ryan's claim of unconscionability. As relevant here, the court concluded that Mr. Ryan had a meaningful choice in deciding whether to accept the terms of the agreement even if his employer refused to give him his paycheck for wages already earned unless he signed the acknowledgment form. The court noted that Mr. Ryan could have simply refused to sign the form and obtained his paycheck later by filing suit for the unpaid wages. As an alternative, the court suggested that Mr. Ryan could have signed the form, received his paycheck, and then quit his employment with Dan's Food Stores, Inc. and sought employment elsewhere at a pharmacy that did not maintain an at-will employment policy. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d at 404. Given the Utah Supreme Court's analysis in *Ryan* of the impact on free choice of being threatened with losing one's current job and being deprived of an expected upcoming paycheck for wages due, we would be hard pressed indeed to find that the AmEx defendants' implicit threat to deprive Ms. Spann and Ms. Higgins of the convenience of having an American Express charge or credit card deprived them of a meaningful choice and made them feel compelled to accept the class arbitration waiver clause.

The second and third factors obviously weigh in favor of the trial court's finding of procedural unconscionability. AmEx Centurion unilaterally inserted the boilerplate class arbitration waiver clause it had drafted into Ms. Spann's and Ms. Higgins's cardmember agreements, and the AmEx defendants do not claim that it was subject to being negotiated. However, as explained above, the first, fourth, fifth, and sixth factors all point toward a finding that there was no procedural unconscionability in the addition of the class arbitration waiver provision to the cardmember agreements.

The Utah Supreme Court confronted this precise constellation of factors in *Ryan v. Dan's Food Stores, Inc.*, in which it rejected a claim of procedural unconscionability. Having thoroughly reviewed the evidence in the record and after carefully considering the arguments of counsel on appeal, we see no reason why the Utah Supreme Court would reach a different result when applying the same calculus to this case. Thus, the Utah Supreme Court's decision in *Ryan v. Dan's Food*

*Stores, Inc.* forecloses the trial court's finding of procedural unconscionability.[19]  Accordingly, the trial court erred in concluding that the class arbitration waiver clause is procedurally unconscionable under Utah law.[20]

As explained above, the class arbitration waiver clause in the arbitration provision added to Ms. Spann's and Ms. Higgins's cardmember agreements is neither substantively nor procedurally unconscionable under Utah law.  Thus, the trial court erred in striking the class arbitration waiver clause from the arbitration provision and ordering that the case be referred to AAA on a "potential class action" basis.  We reverse the trial court's June 29, 2004 memorandum opinion and July 9, 2004 order to the extent they hold to the contrary.[21]

---

[19]Even if this case could be convincingly distinguished from *Ryan v. Dan's Food Stores, Inc.*, the trial court's decision regarding procedural unconscionability would still have to be reversed.  At best, the facts of this case reveal only the most minimal degree of procedural unconscionability in light of the issues at stake, the relative bargaining positions of the parties, and the manner in which the arbitration provision with its class arbitration waiver clause was added to the cardmember agreements.  Procedural unconscionability of such paltry magnitude cannot possibly qualify this case as one of the "rare" instances where gross procedural unfairness alone might support a defense of unconscionability under Utah contract law.  *Sosa v. Paulos*, 924 P.2d at 361; *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d at 1043.

[20]Our resolution of the unconscionability issue makes it unnecessary for us to consider the AmEx defendants' alternative argument that if the class arbitration waiver clause falls, the entire arbitration provision should fall with it, and that any class proceeding must take place in a court of law rather than before an arbitrator.

[21]Following oral argument, the Utah Legislature enacted a statute amending the Utah Consumer Credit Code, Utah Code Ann. §§ 70C-1-101 to 70C-8-203 (2001 & Supp. 2005).  Act of Mar. 1, 2006, ch. 172, § 1-3, 2006 Utah Laws ___ (to be codified at Utah Code Ann. §§ 70C-3-104, 70C-4-102, 70C-4-105).  The legislation permits credit card companies to make unilateral changes to cardmember agreements and apply them to unpaid balances after giving the cardholder thirty days written notice if the cardmember agreement expressly provides for unilateral amendments.  Utah Code Ann. § 70C-4-102(2)(a)(i)-(ii).  The law specifically states that this procedure may be utilized to "include arbitration or other alternative dispute resolution mechanism[s]" in the cardmember agreement.  Utah Code Ann. § 70C-4-102(2)(b).  Moreover, the new legislation expressly authorizes the inclusion of class action waiver clauses in cardmember agreements as long as the waiver is disclosed to the cardholder in the cardmember agreement.  Utah Code Ann. § 70C-4-105(1), (2)(a)-(b).  For contracts entered into after August 1, 2006, the class arbitration waiver clause in the cardmember agreement must be printed in either bold type or all capital letters.  Utah Code Ann. § 70C-4-105(2)(c)(i)-(ii).

Both the AmEx defendants and Ms. Spann and Ms. Higgins filed statements of supplemental authority under Tenn. R. App. P. 27(d) to draw the court's attention to the legislation.  The AmEx defendants contend that the new law demonstrates that class arbitration waiver clauses such as the one in Ms. Spann's and Ms. Higgins's cardmember agreements are consonant with Utah public policy.  For their part, Ms. Spann and Ms. Higgins argue that the statute represents a clear break with the past, further confirming their argument that during the period relevant to this appeal, class arbitration waiver clauses were unconscionable under Utah contract law.

The recent enactment arguably provides some support for our conclusion that the class arbitration waiver clause in Ms. Spann's and Ms. Higgins's cardmember agreements is not substantively unconscionable under Utah law because it does not "shock the conscience" or leave one with a "profound sense of injustice" after contemplating it.  However, we need not and do not rest our decision on this ground.  As explained above, we think it was clear prior to the enactment of the new law and at all times relevant to this appeal that the class arbitration waiver provision in Ms. Spann's and Ms. Higgins's cardmember agreements was not substantively unconscionable under Utah's doctrine of unconscionability.

## V.

We affirm the trial court's July 9, 2004 order granting the motion to compel arbitration, reverse the portion of the order striking the class arbitration waiver clause from the cardmember agreements, and remand the case to the trial court for any necessary further proceedings consistent with this opinion. We tax the costs of this appeal to Louise Spann and Vetahmary Higgins, jointly and severally, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.