Protective Life Ins. Co. v. NationsCredit Fin. Servs. Corp., 2016 NCBC 10.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 6885

PROTECTIVE LIFE INSURANCE
COMPANY,
          Plaintiff,

          v.

NATIONSCREDIT FINANCIAL SERVICES
CORPORATION,
          Defendant.

)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION TO COMPEL
ARBITRATION**

THIS MATTER comes before the Court on Defendant's Motion to Compel Arbitration ("Motion" or "Motion to Compel") pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* On January 19, 2016, the Court held a hearing on the Motion.

THE COURT, having considered the Motion, Plaintiff's opposition to the Motion, the affidavits and evidence provided by the parties, the arguments of counsel, and other appropriate matters of record, FINDS and CONCLUDES as follows:

A. *Factual and Procedural Background.*

1. Plaintiff Protective Life Insurance Company ("Protective") is a Tennessee corporation. Plaintiff sells life insurance and other insurance products.

2. Defendant NationsCredit Financial Services Corporation ("NFS") is a North Carolina corporation. NFS is a residential mortgage lender.

3. NationsCredit Insurance Agency, Inc. ("NIA") apparently is a "captive" insurance agency of Bank of America, and formerly, of Nationsbank. NFS and NIA were at all times relevant to this matter subsidiaries of Equicredit Corporation of America, which is a subsidiary of Bank of America, and are "affiliate companies."[1] NIA is not a residential mortgage lender. NIA is not a party to this lawsuit.

---

[1] Costamanga Aff. ¶ 3; First Hickey Aff. ¶ 5.

4.      From March through May 1997, Protective and NIA negotiated the Agency Agreement and the Administrative Accounting Agreement ("Administrative Agreement").[2] The parties executed the Agency Agreement on May 1, 1997, and the Administrative Agreement on May 28, 1997. The Agreements were signed by Protective and by NIA. NFS was not expressly named as a party to either agreement, and did not sign the Agreements. The Agreements contained identical arbitration provisions. Those provisions stated, in pertinent part, as follows:

> All disputes and differences made between the parties to which an amicable understanding cannot be reached are to be decided by arbitration. Punitive damages against the parties shall not be awarded in, under, or as a part of any such proceeding, but punitive damages assessed against [Protective] in a civil proceeding brought by a third party may be recovered from the Agent in arbitration if the facts establish a right of indemnification. The arbiters, who shall regard this Agreement from the standpoint of practical business and equity rather than from that of strict law, are empowered to fully interpret this Agreement and the obligations upon the parties created thereunder.[3]

5.      In or around the same time that the Agreements were executed, Protective issued to NFS a "Single Premium Group Policy," with an effective date of May 1, 1997 ("Group Policy").[4] NIA was not named as a party to or an insured under the Group Policy. The Group Policy defined NFS as the "Creditor," required Protective to furnish NFS with certificates of insurance to be delivered to each insured, and required NFS to pay the premiums to Protective.[5]

6.      In or around May 1997, Protective also issued to NIA a "Single Premium Group Net Pay-Off Policy" ("Net Pay-Off Policy").[6] The Net Pay-Off Policy was nearly identical to the Group Policy except for the maximum benefits payable. The effective date of coverage

---

[2] First Hickey Aff., Exs. A and B; the Agency and Administrative Agreements collectively are hereinafter referred to "the Agreements".

[3] *Id.* at § 19.

[4] Pl.'s Opp. to Mot. to Compel, Ex. 3.

[5] *Id.*

[6] *Id.*

under the Net Pay-Off Policy was May 28, 1997.[7] The Net Pay-Off Policy defined NIA as the "Creditor" and required NIA to pay the premiums to Protective.

7. There is no dispute that the purpose of the relationship created by the Agreements and policies was to permit NFS to offer and sell credit life and disability policies to borrowers to whom NFS made residential mortgage loans. Protective underwrote and provided the policies of insurance. In the event a borrower died or became disabled, the policy would pay off the borrower's mortgage. The relationship benefited each of the parties: Protective received premiums on the policies sold by the lender, NIA received an administrative fee, and NFS "as the lender, received a benefit through lower default rates and customer satisfaction."[8]

8. The Agreements provided that NIA was responsible for obtaining the requisite licensing for individuals selling its insurance products, and that Protective would appoint these individuals as its agents. It is undisputed that the individuals primarily appointed to act as Protective's agents were NFS loan officers responsible for residential mortgage loans. The agreements also provided that NIA had authority to deliver certificates of insurance on behalf of Protective to debtors who met certain health requirements. Finally, the agreements provided that NIA would pay the premiums collected to Protective, and that NIA would receive an administrative fee for the policies it sold.

9. NFS' loan officers sold credit life and disability insurance policies issued by Protective to North Carolina borrowers from May 1, 1997, to April 30, 1999.

10. In 2002, a group of NFS' North Carolina borrowers filed a lawsuit against NFS for alleged unfair and deceptive trade practices, breach of the duty of good faith and fair dealing, and unjust enrichment related to the sale of the insurance policies written by, among

---

[7] *Id.*
[8] *Id.* Ex. 4, interrogatory nos. 49 and 51.

others, Protective. (*Juanita Richardson, Robert and Gloria Gower, and Joyce M. Smith v. Bank of America, N.A. and NationsCredit Financial Services Corporation* (Durham County, 02-CVS-2398); "the *Richardson* lawsuit"). The *Richardson* lawsuit subsequently was certified as a class action. The trial court ultimately determined that many of the policies written by Protective and issued to NFS' borrowers were unlawful and in violation of public policy. After the trial court's orders were affirmed on appeal, the parties reached a settlement, with class members' claims to be paid from a settlement fund not to exceed $36,907,263.33. The payment amount of each individual claim was determined according to formulas contained within the settlement agreement, derived from the trial court's determination of the measure of damages. The payment amount did not include an allowance for punitive damages, but did include treble damages as allowed by the North Carolina Unfair Trade Practice Act, N.C. Gen. Stat. §§ 75-1.1 *et seq*. NationsCredit funded the settlement agreement in March 2009.

11. The Agency and Administrative Agreements contained identical indemnification provisions which provide, in pertinent part, as follows:

> [Protective] agrees to indemnify and hold harmless the [NIA] from and against all damages, losses, claims, legal expenses, attorneys' fees, judgments, settlement costs or demands arising out of or related in any way to the administration of the policies and the administration of claims, but excluding liability arising out of all denials of claims and terminations of coverage to which the [NIA] or an affiliate thereof gives prior consent. Without limiting the generality of the foregoing, the indemnification of either party shall extend to and include punitive damages.[9]

12. In a letter dated February 16, 2005, NFS demanded that Protective indemnify NFS for the losses associated with its settlement of the class action lawsuit pursuant to the indemnification provisions in the Agency and Administrative Agreements. Protective denied that it was obligated to indemnify NFS.

---

[9] First Hickey Aff., Exs. A and B at §16.

13.     On March 18, 2015, NFS served a Notice of Dispute and Commencement of Arbitration on Protective.  Protective refused to participate in the arbitration and, on April 19, 2015, filed this declaratory judgment action.  Protective seeks declarations that (a) no valid arbitration agreement exists between Protective and NFS, (b) "[s]hould the court conclude that a valid arbitration agreement exists between [Protective and NFS] . . . that all claims [NFS] seeks to assert against [Protective] are barred by the applicable statute of limitations," and (c) "[s]hould he court conclude that a valid arbitration agreement exists between [Protective and NFS] … that [NFS'] indemnity claims seeking treble (punitive) damages are not within the scope of the arbitration agreement and thus cannot be arbitrated."[10]

14.     On June 29, 2015, NFS filed the Motion to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §3 and Rule 12(b)(1) of the North Carolina Rules of Civil Procedure.  NFS contends that it is an intended third party beneficiary of the Agency and Administrative Agreements and, accordingly, is entitled to enforce the arbitration obligations in those agreements against Protective.

B.  *Discussion and Analysis*.

i.     **Arbitrability of NFS' Indemnification Claim.**

15.     NFS moves to compel Protective to arbitrate the indemnity claims under the Agency and Administrative Agreements on the grounds that NFS is an intended third-party beneficiary of those agreements entitled to enforce the arbitration provisions. Alternatively, NFS contends that Protective should be equitably estopped from denying that NFS is entitled to arbitrate because Protective understood the nature of the relationship between NFS and NIA, the agreements were intended to permit NFS to sell Protective's insurance

---

[10] *See* Compl.

products to its NFS' borrowers, and Protective made "millions of dollars" from NFS' sale of the insurance products.

16.     The Court's first task is to determine the law applicable to deciding the issues. The contracts provide that they will be governed by "Title 9 of the U.S. Code [FAA], the laws of the State of Tennessee and the applicable regulations of the Insurance Department of the State of Tennessee."[11]  North Carolina courts enforce contractual choice of law provision as long as the parties have a reasonable basis for their choice, and the law of the chosen state does not violate a fundamental public policy of North Carolina. *Cable Tel Servs. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 643-44 (2002); *Torres v. McClain*, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000).  The parties agree that the FAA[12] and Tennessee law apply to the determination of the Motion to Compel Arbitration.  *Bailey v. Ford Motor Co.*, 2015 N.C. App. LEXIS 1032 * 8 (N.C. Ct. App. Dec. 15, 2015) ("If the parties affirmatively chose the FAA to govern an agreement to arbitrate, then the FAA will apply to that agreement.") Protective is a Tennessee corporation, so there exists a reasonable basis for the application of Tennessee law, and application of the FAA and Tennessee law do not violate any fundamental policy of North Carolina.

17.     Accordingly, this Court must determine (i) whether an agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *See Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997); *Blackmon v. LP Pigeon Forge, LLC,* 2011 Tenn. App. LEXIS 473 * 36 (Tenn. Ct. App. Aug. 25, 2011) ("A party moving to compel arbitration must show both the existence of a valid agreement to arbitrate and a dispute that falls within the scope of such agreement.").  The parties do not dispute that the

---

[11] First Hickey Aff., Exs. A and B at § 23.
[12] The Court finds that the Agency and Administrative Agreements are contracts "involving commerce" and the FAA applies to those agreements. *King v. Bryant*, 225 N.C. App. 340, 344 (2013).

Agency and Administrative Agreements contain valid and binding arbitration clauses. Rather, the issue is whether NFS, as a non-signatory, is entitled to enforce the arbitration provisions in those agreements. This question is subsumed in the question of whether an agreement to arbitrate exists between NFS and Protective, and is a matter of Tennessee law.[13] *See Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631 -32 (2009) (holding that a non-party can enforce an arbitration agreement if the relevant state contract law allows him to enforce the agreement).

18. Under Tennessee law, contracts "are presumed to be executed for the benefit of the parties thereto and not third persons." *Chaves v. Bank of America,* 2014 U.S. Dist. LEXIS 90800 (E.D. Tenn. July 3, 2014) (citing *Owner-Operator Indep. Drivers Ass'n v. Concord,* 59 S.W.3d 63, 68 (Tenn. 2001)). Accordingly, one who seeks third-party beneficiary status bears the burden of proving from the terms of the contract itself or the circumstances surrounding the contract's execution that he is entitled to recover. *Rutherford County v. City of Murfreesboro,* 304 S.W.2d 635, 637 (Tenn. 1957); *Oman Constr. Co. v. Tennessee C.R. Co.,* 370 S.W.2d 563, 577 (Tenn. 1963). A third party is an intended beneficiary of a contract, when:

> (1) the parties to the contract have not otherwise agreed; (2) recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and (3) terms of the contract or the circumstances surrounding performance indicate that either: (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or (b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Owner-Operator,* 59 S.W.3d at 70; *Goot v. Metropolitan Gov't of Nashville and Davidson County,* 2005 Tenn. App. LEXIS 708 * 46-47 (Tenn. Ct. App. Nov. 9, 2005).

---

[13] Def.'s Br. Supp. Mot. Compel p. 10; Pl.'s Opp. Mot. Compel, p. 6.

19.     In applying the intended third-party beneficiary test, the courts' primary focus is the intent of the contracting parties. *Owner-Operator,* 59 S.W.3d at 70. There must be "clear and direct" evidence that the benefit is intended to flow to the third party. *Id.* at 69. "If . . . the benefit flowing to the third party is not intended, but is merely incidental, the third party acquires no right to enforce the contract." *Id.* at 69-70. In order for a third party to derive a benefit from a contract between two other parties, "it must appear . . . that the contract was made and entered into directly or primarily for the benefit of such third person." *Id.* at 69 (citing *Abraham v. Knoxville Television, Inc.,* 757 S.W.2d 8, 11 (Tenn. Ct. App. 1988)); *Chaves,* 2014 U.S. Dist. LEXIS 90800 at *   (same); *Burke v. Regions Bank,* 2013 U.S. Dist. LEXIS 5826 * 8-9 (W.D. Tenn. Jan. 15, 2013); *TIG Ins. Co. v. Titan Underwriting Managers,* 2008 Tenn. App. LEXIS 777 *8 (Tenn. Ct. App. 2008). An intended beneficiary's rights are measured by the contract itself, thus courts must analyze third-party contract claims by construing the contract as a whole rather than in a piecemeal fashion. *Goot*, 2005 Tenn. App. LEXIS 708 at *47.

20.     With regard to the first factor under the *Owner-Operator* test, the Agency and Administrative Agreements do not expressly state that NFS, or any other third-party, <u>is</u> <u>not</u> an intended beneficiary of the agreements. The lack of such an express provision is some evidence that the parties did not intend to exclude NFS from asserting rights under the Agreements. *See TIG Ins. Co.,* 2008 Tenn. App. LEXIS 777 at *9 (concluding that the defendant was not an intended third-party beneficiary where contract contained express provision stating that it did not create rights in any third party); *AmSouth Erectors, L.L.C. v. Skaggs Iron Works, Inc.*, 2003 Tenn. App. LEXIS 551 at * 11 (Tenn. Ct. App. Aug. 5, 2003) (same). Nevertheless, NIA argues that the Agreements, each construed as a whole, establish that the Protective and NIA did not intend for NFS to be a third party beneficiary. First, neither the Agency nor Administrative Agreements expressly mention NFS. Neither

agreement expressly place any obligations on, or grant any benefits, to NFS. In addition, the Agreements restrict the parties' rights to assign the "[a]greement and any rights arising [thereunder]" without the written consent of the other party.[14] *Owner-Operator,* 59 S.W.3d at 71 (recognizing that, while not dispositive of the issue, anti-assignment provisions in a contract "demonstrate that the terms of the contract were intended to only benefit the parties to the contract"; citing *First Tennessee Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.,* 932 S.W.2d 928, 931 (Tenn. Ct. App. 1996)). Protective further points out that the arbitration provision itself is uniquely worded, limiting its application to "[a]ll disputes and differences made ***between the parties.***"[15] Protective contends that this language is evidence of the parties' intention that the arbitration rights under the Agreements were explicitly limited to disputes between Protective and NIA.

21. The parties differ as to the import of the indemnity provisions in the Agreements in determining whether NFS was an intended beneficiary. The indemnity provisions allow Protective to seek indemnity for claims or losses arising from "the solicitation, sale or servicing of any insurance product of the Company through [NIA] or its affiliates," but limits Protective to indemnifying only NIA for losses arising from Protective's "administration of the policies and the administration of claims."[16] Protective argues that the indemnity provision must be interpreted to mean that that while NIA's affiliates might be responsible for indemnifying Protective, NIA's affiliates are excluded as parties for whom NIA can seek indemnity from Protective.[17] On the other hand, NFS contends that the indemnity provisions establish that Protective expressly recognized that NIA's "affiliates,"

---

[14] Agreements § 20.
[15] *Id.* ¶ 19 (emphasis added).
[16] Agreements § 16.
[17] Pl.'s Opp. Mot. Compel pp. 10-11.

including NFS, would be soliciting, selling, and servicing of Protective's insurance, and accordingly were intended beneficiaries of the Agreements.[18]

22. The second *Owner-Operator* factor that must be considered is whether permitting NFS to enforce the Agreements would "effectuate the intention of the parties." 59 S.W.3d at 70. NFS contends that the entire nature of the relationship between Protective and NIA shows that the intent behind the Agreements was to provide NFS with authority to sell Protective's life and disability policies to NFS' "debtors" (borrowers).[19] It is undisputed that NIA did not make loans and did not have borrowers or "debtors."[20] Protective appointed NFS' loan officers as agents for Protective under the Agreements,[21] but it is not clear whether Protective knew that the individuals being appointed were employees of NFS and not NIA.

23. NFS also argues that the Agreements are "inextricably intertwined" with the Group Policy issued by Protective to NFS under which it was able to provide the policies of insurance and that the Agreements and the Group Policy must be considered together.[22] The Certificates of Insurance issued by Protective listed "NationsCredit/Affiliates" as the "First Beneficiary".[23] The benefits paid out by Protective were paid to NFS, and not to NIA.[24] NFS presented testimony, which Protective did not rebut, that the relationship between Protective, NFS, and NIA as NFS' "captive" insurance agency was "typical and routine for the [home mortgage lending] industry."[25]

---

[18] Def.'s Br. Supp. Mot. Compel p. 14.
[19] Agreements § 1.
[20] First Hickey Aff. ¶ 10.
[21] *Id.* ¶ 13
[22] Def.'s Br. Supp. Mot. Compel pp. 14 – 15.
[23] First Hickey Aff. ¶¶ 14 and 16; Ex. D.
[24] *Id.* ¶ 16.
[25] *Id.* ¶ 18.

24.     The Agreements and the Group Policy contained conflicting requirements as to whether NIA or NFS was responsible for delivering the premiums collected from borrowers to Protective. The evidence on this question also appears to be conflicted. NFS provided affidavit testimony that it "delivered to Protective the premiums it collected on the policies."[26] Protective counters, however, that this assertion is contradicted by sworn interrogatory responses made by NFS in the *Richardson* lawsuit in which NFS stated that NIA "received" the premiums paid by NFS' borrowers and "disbursed" them to Protective.[27] Protective argues that NFS' response in Richardson is further evidence that NIA, but not NFS, was the intended beneficiary under the Agreements.

25.     Protective contends that it would not "effectuate the parties' intent" to allow NFS to enforce the Agreements as a third-party beneficiary because NFS "had a separate contract with Protective – the [ ] Group Policy issued by Protective to Financial Services on May 1, 1997 - from which Financial Services derived a direct benefit."[28] The Group Policy defined the rights and obligations as between Protective and NSF and it did not contain an arbitration agreement, but did contain a merger clause stating that it constituted the "entire contract" between the parties.[29] Protective contends that in the *Richardson* lawsuit, NFS admitted that the only benefit it derived under the Agreements was "lower default rates and customer satisfaction" of its borrowers.[30] Protective argues that these were at best incidental, but not direct, benefits.[31] Since NFS derived a "direct benefit" from the Group

---

[26] *Id.* ¶ 15.
[27] Pl.'s Ex. 4, Interog. 49.
[28] Pl.'s Opp. Mot. Compel p. 11.
[29] *Id.* pp. 11-12; The Court notes that the Agreements do not contain merger clauses or other language indicating that they constitute the entire agreement between the parties.
[30] Pl.'s Ex. 4, Interog. 51.
[31] Pl.'s Opp. Mot. Compel p. 15.

Policy, "recognizing [NFS] as a third-party beneficiary of the Agreements would not further the objectives of Protective and [NIA] in making the Agreements."[32]

26. Protective cites to evidence that it was the Net Pay-Off Policy that was at issue in the *Richardson* lawsuit and that resulted in the loss underlying NFS' indemnity claim and that the Certificates of Insurance relied upon by NFS each indicate that they were issued under the Net Pay-Off Policy issued to NIA, and not the Group Policy.[33] Accordingly, Protective argues that "the Group Policy issued by Protective to [NFS] is not clear and direct evidence that [NFS] was an intended third-party beneficiary of the Agreements between Protective and [NIA] since Protective also issued a separate [ ] Net Pay-Off Policy to [NIA]."[34]

27. With regard to the third factor, NFS does not contend that requiring Protective to arbitrate NFS' claims would "satisfy an obligation or discharge a duty owed by the [NIA] to the [NFS]". Instead, it relies on the second part of third factor and contends that the "terms of the contract or the circumstances surrounding performance" indicate NIA "intend[ed] to give [NFS] the benefit of the promised performance" under the Agreements. *Id.* As noted above, the terms of the contracts themselves lend some support to NFS' position that NIA intended that NFS would benefit from Protective's performance since the Agreements do not expressly exclude third party rights and the language of the indemnity provision recognizes that NIA's "affiliates" may be involved in soliciting and selling Protective's policies. More significantly, however, the circumstances surrounding the performance of the Agreements establishes that NIA entered into the contracts to benefit NFS. It is undisputed that NIA did not have "debtors" to whom it could sell the death and disability policies. NFS presented evidence that NIA existed primarily to serve as an agent

---

[32] *Id.* p. 12.
[33] *Id.* pp. 16-17; Pl.'s Ex. 6; First Hickey Aff., Ex. D.
[34] *Id.* p. 17.

to insurance companies to facilitate NFS' sale of credit life and disability insurance to its borrowers.[35] NIA got NFS' loan officers appointed as agents of Protective so that they could solicit and sell Protective's policies to NFS' borrowers. In addition, the insurance sold through NIA to NFS' borrowers pursuant to the Agreements paid benefits directly to NFS upon the death or disability of the borrower. The circumstances surrounding the performance establish that NIA intended Protective's performance under the Agreements to benefit NFS.

28.     Having considered the applicable factors, the Court must now determine whether there is "clear and direct" evidence that the parties intended the Agency and Administrative Agreements to benefit NFS as a third-party. *TIG Ins. Co. v. Titan Underwriting Managers,* 2008 Tenn. App. LEXIS 777 *7-8; *Owner-Operator,* 59 S.W.3d at 69-70. Although the Agreements do not contain express provisions excluding third-party rights, they also do not contain language clearly providing that NFS was intended to be a beneficiary. The Court cannot conclude that the terms of the Agreements, standing alone, provide clear and direct evidence that the parties intended NFS to be a beneficiary.

29.     When the Agreements are considered in the proper context of the parties' business relationship, however, the Court concludes that the record evidence shows that the Agreements were intended to benefit NFS such that NFS is a third-party beneficiary under those Agreements. As noted above, the record evidence shows that the purpose of the insurance policies sold in this business relationship was to protect NFS' borrowers from default in the event of death or disability. The ultimate benefit of this arrangement clearly runs to NFS in the form of additional security for their loans. Additionally, it is clear from the record evidence that NIA's primary purpose, if not its only purpose, was to facilitate the

---

[35] Second Hickey Aff. ¶ 4.

issuance of Protective policies to NFS' debtors. As such, although there is some evidence that the parties did not expressly agree to treat NFS as a third-party beneficiary, the close-knit nature of the relationship between Protective, NFS, and NIA as reflected in the record evidence shows that Protective and NIA did not agree to preclude NFS from obtaining third-party beneficiary status under the Agreements.

30.     The Court also concludes that allowing NFS to enforce the arbitration provision in the Agreements would effectuate the intent of the parties. The primary objective of the parties' business arrangement was to allow NFS to sell Protective's insurance policies to NFS' borrowers as it is undisputed that NIA was not a mortgage lender and had no debtors. The Agreements set out many of the terms upon which NFS' agents were ultimately authorized to sell those policies. The evidence shows that NIA intended to give NFS the benefit of Protective's performance, and that NFS was an intended third-party beneficiary of the Agreements.

31.     Ultimately, the Court concludes that the record evidence shows all three elements of the *Owner-Operator* third-party beneficiary test are satisfied, and that NFS should be entitled to avail itself of the arbitration provision in the Agreements. Having so concluded, the Court now turns to Protective's arguments concerning the arbitrability of the specific dispute at issue.

### ii.     Protective's Statute of Limitations Defense.

32.     Protective argues that the NFS' claim for indemnity falls outside of the scope of the arbitration agreement because it is barred by the statute of limitations.[36] Protective

---

[36] In its Opposition to the Motion to Compel Arbitration, Protective also suggests that NFS' claim is barred by the equitable doctrine of laches. In the Complaint, Protective sought a declaration that NFS' claim is barred by the statute of limitations, but not a declaration regarding the application of laches to the claim. Even if the Court concluded that it could properly rule on a laches defense, Protective concedes that laches requires a showing of "prejudice to the defending party," but fails to state how, or even if, it has been prejudiced by any delay. Pl.'s Opp. Mot. Compel p. 31.

contends that NFS' claim accrued on or about September 21, 2005, when Protective sent NFS a letter that "properly denied" the demand for indemnification, and that NFS' claim is barred by the six year statute of limitations applicable to breach of contract actions.[37] NFS contends that timeliness defenses to its claim, including the statute of limitations and laches, are issues of procedural arbitrability that must be decided by the arbitrator and not this Court. In addition, NFS argues that its claim for indemnification did not accrue until March 28, 2009 when it funded the settlement.

33.    Preliminarily, the parties disagree as to whether this Court's authority to rule upon the statute of limitations issue is one of federal or state law.  The case decisions under the FAA are clear; the issue of application of a statute of limitations and other challenges to the timeliness of claims in arbitration is for the arbitrator to determine, and not for the court. The Fourth Circuit Court of Appeals has held:

> If "the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute." All other issues raised before the court not relating to these two determinations fall within the ambit of "procedural arbitrability."

*Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997) (citation omitted). Accordingly, "questions of mere delay, laches, statute of limitations, and untimeliness raised to defeat the compelled arbitration are issues of procedural arbitrability exclusively reserved for resolution by the arbitrator." *Id.* at 456; *see also Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84-85 (2002) (issues including whether claims were timely raised are to be decided by the arbitrator).

34.    Protective contends that the question of whether the statute of limitations bars NFS' indemnity claim is for the Court, and not the arbitrator, to decide.  In support of its

---

[37] Pl.'s Opp. Mot. Compel pp. 30 – 32.

argument, Protective cites the Tennessee Court of Appeals decision in *Spann v. Am. Express Travel Related Servs. Co.*, 224 S.W.3d 698 (Tenn. Ct. App. 2006).[38] In *Spann*, the plaintiffs challenged to an arbitration provision on the grounds that it was unconscionable. The court, however, did not address the question of whether the court or an arbitrator should decide the issue, noting that the parties had expressly stated "that they did not intend to arbitrate the validity of the [arbitration provision] and that . . . they would prefer to have the unconscionability challenge . . . resolved by the courts rather than an arbitrator." *Id.* at 708.

35. Nevertheless, Protective apparently contends that since the court in *Spann* recognized that "the FAA requires courts to enforce written agreements to arbitrate in contracts affecting interstate commerce 'save upon such grounds as exist at law or in equity for the revocation of any contract,'" *Id.* at 709, this Court should rule on its state statute of limitations defense. The Court disagrees. Protective's statute of limitations defense goes to neither whether "a valid agreement to arbitrate exists between the parties" nor whether "the specific dispute falls within the substantive scope of that agreement". *Glass*, 114 F.3d at 453. Rather, whether or not the statute of limitations bars NFS' claim for indemnification is properly decided by the arbitrator. *Cooper Carry, Inc. v. Opry Mills, L.L.C.*, No. 3:05 0297, 2005 WL 1871109, *1 (M.D. Tenn. Aug. 3, 2005) (holding that issues such as time limitations and waiver are issues of "procedural arbitrability" for the arbitrator, and not the court, to decide).

### iii. Arbitrability of claim for punitive damages.

36. Protective also contends that NFS' claim for indemnification falls outside of the scope of the agreement because the arbitration clause excludes "claims for punitive damages."[39] The damages for which NFS seeks indemnification are based, in part, on the

[38] Pl.'s Opp. Mot. Compel p. 31.
[39] Pl.'s Opp. Mot. Compel pp. 23, 26.

availability of treble damages under Chapter 75 of the North Carolina General Statutes ("UDTPA"). Protective argues that the treble damages available under the UDTPA are punitive in nature, and accordingly, NFS' claim for indemnity falls outside the scope of arbitration provision and is not arbitrable.[40] NFS contends, *inter alia*, that (a) determining whether punitive damages are available under the arbitration agreement would violate the FAA by requiring the Court to rule on an issue that is for the arbitrator, and (b) the arbitration provision only excludes an award of punitive damages in claims brought by the parties "against one another" and not claims for indemnity.

37. The availability of punitive damages for claims arising under the Agency and Administrative Agreements is, at a minimum, difficult to discern. Section 19 of the Agreement, governing arbitration, provides in relevant part that "[p]unitive damages against the parties shall not be awarded in, under, or as a part of any such proceeding, but punitive damages assessed against the [Protective] in a civil proceeding brought by a third party may be recovered from the Agent in arbitration if the facts establish a right of indemnification." The arbitration provision does not expressly provide for the recovery of punitive damages by the Agent in an indemnification claim brought against Protective. On the other hand, the indemnification provision (section 16) contained in the agreements does not seem to limit indemnification for punitive damages to indemnity claims brought by Protective, stating that "the indemnification of *either* party shall extend to and include punitive damages." (emphasis added).[41] It is difficult to see how these two provisions could be reconciled.

---

[40] At the hearing, Protective's counsel conceded that at least a portion, in this case probably one-third, of the amount for which NFS seeks indemnity is compensatory, and not treble, damages.

[41] Read together, these provisions appear to create an anomaly that permits both parties to seek to recover punitive damages awarded against it through an indemnity claim, but authorizes an arbitrator to award such damages only in an indemnity claim brought by Protective. At the hearing, Protective's counsel suggested that this simply meant that the Agent would have to seek indemnity for punitive damages through a court action and not in arbitration. In such a scenario, however, Protective would undoubtedly contend that the Agent was required to arbitrate its indemnity claim under the

38.    A more fundamental problem, however, exists with Protective's position. Protective's contention that the arbitration provision in the Agency and Administrative Agreements excludes from arbitration "claims for punitive damages" is simply incorrect based on the plain language of the provision.  While the arbitration provision states punitive damages "shall not be awarded in, under, or as part of any [arbitration] proceeding," it does not state that claims seeking punitive damages as a remedy cannot be made in arbitration. Rather, the language appears to create a limitation on the arbitrator's authority to award punitive damages as a remedy for claims brought in arbitration.  Accordingly, the Court concludes that the punitive damages language in the arbitration provision is not a limit on the scope of the claims that may be arbitrated.  Instead, the question of whether NFS may recover the treble damages component of its indemnity claim is an issue of interpretation best committed to the authority the parties' gave the arbitrator to "fully interpret [the Agreements] and the obligations upon the parties created thereunder."[42]

39.    Ultimately, the Court concludes that NFS is a third-party beneficiary under the Agreements, and is therefore entitled to arbitrate its dispute with Protective under those Agreements. Neither Protective's statute of limitations defense, nor its position regarding punitive damages warrant a different conclusion. Accordingly, for the reasons discussed above, the Court concludes that the Motion to Compel Arbitration should be GRANTED.

THEREFORE, IT IS ORDERED that:

40    NationsCredit Financial Services Corporation's Motion to Compel Arbitration is GRANTED.

---

agreements, thus forcing the Agent into a forum where it arguably cannot recover the punitive damages.
[42] First Hickey Aff.  Exs. A and B, § 19.

41.     Plaintiff shall within thirty (30) days of this Order file with the Court its position as to whether there is any further relief requested in the Complaint that has not been resolved by this Order such that this action should not be dismissed.

This the 2nd day of February, 2016.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
   for Complex Business Cases